**UNITED STATES DISTRICT COURT FOR
SOUTHERN DISTRICT OF NEW YORK**

MICHAEL LAFONTANT,

                Plaintiff,

        v.

WASHINGTON SQUARE FINANCIAL,
LLC d/b/a IMPERIAL STRUCTURED
SETTLEMENTS, IMPERIAL FINANCE &
TRADING, LLC;
IMPERIAL HOLDINGS INC.; and
ANDREW LEVINE

                Defendants.

FILED
U.S. DISTRICT COURT

2014 DEC 15 PM 4: 59

S.D. OF N.Y.W.P.

Case No.    **14 CIV. 9895**

**COMPLAINT**

**JURY TRIAL DEMANDED**

**JUDGE SEIBEL**

## NATURE OF THE CASE

1.      Plaintiff brings this action to seek redress for Defendants' egregious scheme to defraud Plaintiff out of millions of dollars in periodic payments due to Plaintiff under a structured settlement annuity. Defendants preyed upon and took advantage of Plaintiff, made material and fraudulent misrepresentations to Plaintiff, and caused Plaintiff to lose all of the tax free benefits and protections that were built into the settlement agreement reached in connection with the traumatic wrongful death of Plaintiff's mother. Within a span of less than six months, Defendants managed to prepare and file three knowingly falsified and misleading petitions with a Sumter County, Florida court and one transaction with a Broward County, Florida court that were not in Plaintiff's best interests, and which bore no rational relationship to Plaintiff or Defendants, resulting in suspect structured settlement payment rights transfers in excess of $4,000,000 to Defendants or their agents. Never once did Plaintiff appear in Sumter County or Broward County and, upon information and belief, Defendants knew that they could get the aforesaid petitions granted in Florida even though Plaintiff resided in and was domiciled in New York, was solicited in New York, and even had a transfer petition filed and pending in New York while Defendants orchestrated his "relocation" to Florida. None of the aforesaid petitions met the "best interest" standard outlined in Fla. Stat. § 626.99296 (the "Florida Transfer Act") nor did they comply with the spirit or letter of New York law, Florida law or Internal Revenue Code § 5891. Plaintiff's allegations herein are made upon information and belief, except those allegations which are alleged upon personal belief. The facts herein are alleged in their totality and in the alternative. Certain of the facts supporting the allegations contained herein are known only by one or more of the Defendants, or are exclusively within their custody and control. Further, in some instances the real identities of the actual entities or individuals acting on behalf of these entities are only known

1

to certain Defendants. Plaintiff believes that further substantial evidentiary support for some of the allegations in this Complaint will become available after a reasonable opportunity for discovery.

## PARTIES

1.    Plaintiff Michael Lafontant is an individual who resided in and was domiciled in the State of New York at all times relevant to the transactions.

2.    Defendant Imperial Holdings Inc., is a corporation organized under the laws of the State of Florida with offices at The Plaza, 5355 Town Center Road, Suite 701, Boca Raton, Florida 33486 and through its subsidiaries operates a specialty finance company that at all times relevant to this Complaint purchased payment rights arising out of structured settlement annuities.

3.    Defendant Imperial Finance & Trading, LLC is a limited liability company organized under the laws of the State of Florida, with a principal office at The Plaza, 5355 Town Center Road, Suite 701, Boca Raton, Florida 33486.

4.    Defendant Washington Square Financial, LLC is a limited liability company organized under the laws of the State of Georgia, with a principal address at The Plaza, 5355 Town Center Road, Suite 701, Boca Raton, Florida 33486.

5.    All of the above named corporate Defendants are affiliates and shall, at times, be collectively referred to as "Imperial".

6.    Upon information and belief, Andrew Levine ("Levine") is an individual who at all times relevant to the Complaint was an employee of Imperial and is currently a resident of the State of Florida.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action based on diversity of citizenship, pursuant to 28 U.S.C. § 1332. Plaintiff is a lifetime New Yorker who currently resides in Reading, Pennsylvania with relatives who agreed to provide for him as a result of the actions complained of herein. He intends to return to New York once he can afford to do so. Defendants, other than Washington Square Financial, LLC, are all citizens of the State of Florida. Upon information and belief, Washington Square Financial, LLC is a Georgia Limited Liability Company that is affiliated with the other Defendants and maintains an office in the State of Florida.

8.    Venue is proper in this District, pursuant to 28 U.S.C. §1391(a) (2) in that a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

## BACKGROUND

9.    In or about June 1996, when Plaintiff Michael Lafontant ("Lafontant") was four years old, he received a structured settlement annuity in connection with the settlement of a wrongful death case involving his mother, Giselene Lafontant. The terms of his structured settlement are set forth below:

> A life annuity with guaranteed payments for 30 years was purchased on behalf of the Plaintiff from Allstate Life Insurance Company of New York. The structured settlement called for the following periodic payments to Plaintiff:
>
> - $6,250 per month for life, increasing 3% annually, with first payment on 6/22/09, plus lump sums of:

3

- $40,000 on 6/22/09

- $40,000 on 6/22/10

- $40,000 on 6/22/11

- $40,000 on 6/22/12

- $40,000 on 6/22/13

- $100,000 on 6/22/16

- $150,000 on 6/22/21

- $253,914 on 6/22/26

10.     The aforementioned payments were intended to be entirely tax free to Plaintiff and were designed to compensate Plaintiff for the loss of his mother. These payments were enough to provide Plaintiff with sufficient risk free funds to cover basic needs, and then some, for the remainder of his natural life.  For example, by 2030, the settlement would have paid Plaintiff $11,626.84 per month, and would have continued to increase at a 3% per annum rate until his death.

11.     In or about October, 2010, one Andrew Levine ("Levine") solicited Plaintiff on behalf of a company known as Settlement Funding, LLC. ("Settlement Funding").

12.     Upon information and belief, Settlement Funding is an affiliate of a national brand structured settlement factoring company known as "Peachtree".

13.     Mr. Levine befriended Plaintiff, a naïve 19 year old young man, who desired to sell a small portion of his structured settlement payments in order to pay speeding tickets, attorneys' fees for a criminal case against a family member for theft, his car loan, a personal loan, and tuition at community college.

14.     On or about October 8, 2010 Settlement Funding filed a petition in New York's Orange County Supreme Court (the "2010 Orange County Petition") pursuant to New York General Obligations Law § 5-1701, *et seq*. (the "New York Transfer Act") seeking to purchase certain payments from Plaintiff.

15.     At the time the 2010 Orange County Petition was filed, Plaintiff resided at 12 Redwood Drive, Highland Mills, NY 10930.

16.     According to the Order issued on January 6, 2011 Plaintiff sold three lump sum payments in the amount of $30,000 each due on June 22, 2011, June 22, 2012, and June 22, 2013; and one lump sum payment of $100,000 due to him on June 22, 2016 to Settlement Funding of New York LLC for $101,120.86.

17.     Upon information and belief, in or about early 2011, Levine approached Plaintiff about selling more of his structured settlement payments.

18.     Plaintiff had an interest in selling some of his future periodic payments to fund a hip hop artist representation business he was starting called Flight Life, Inc.

19.     In order to finance this new business, Plaintiff sought the counsel of an entertainment law specialist, came up with a business plan that outlined a need for approximately $110,000 to build the business, and then in connection therewith sought to sell a modest portion of his structured settlement annuity payment rights to raise that amount.

20.     Defendant Levine assured Plaintiff that he could get him a great deal.

21.     On May 23, 2011, Settlement Funding filed a second petition in New York's Orange County Supreme Court (the "2011 Orange County Petition"), seeking to sell 240 monthly payments each in the amount of $1,550 commencing June 22, 2014 through and including May 22, 2034, increasing 3% annually, and $125,000 due on or about June 22, 2026.

22.     In exchange for the sale of the above referenced payments totaling $724,788.97 Plaintiff was to receive $130,000. According to the disclosures provided to Plaintiff the discount rate for this transaction was 15.35%.

23.     At the time the 2011 Orange County Petition was filed, Plaintiff resided at 12 Redwood Drive, Highland Mills, NY 10930.

24.     Even though Plaintiff desired to sell a portion of his payments to finance his entertainment business, on several occasions Judge Lawrence H. Ecker, presiding in the Supreme Court of New York, Orange County, requested additional information and documentation from Plaintiff regarding his business plans and also requested copies of all documentation regarding the previous sale of his structured settlement payments pursuant to the 2010 Orange County Petition.

25.     Even after selling these additional payments under the 2011 Orange County Petition to finance his entertainment business, Plaintiff would have continued to receive monthly payments of $6,630 per month through May, 2012, then $6,829.54 per month through May, 2014 increasing 3% annually, then $5,695 per month through May, 2034, increasing 3% annually. Plaintiff would have also continued to receive lump sum payments as follows: $10,000 in June, 2011, 2012 and 2013; $50,000 in June, 2021, and $128,914 in June, 2026.

26.     Upon information and belief, in or about October 2011, Defendant Levine informed Plaintiff that he was moving from Peachtree to Imperial. Levine told Plaintiff that Imperial had a way to get his deal approved quickly in Florida and that Levine would "take care of everything". Levine told Plaintiff to cease working with Peachtree and that he should work with Levine's new company, Imperial. Levine told Plaintiff that he would get a better deal working with Imperial than the one that was pending in Orange County.

6

27.     Upon further information and belief, Levine told Plaintiff that Florida had "better rates" than New York, and so Levine would be able to get Plaintiff more cash in Florida than in New York without selling any more of his future payments. Levine then told Plaintiff that because this deal was just like the pending deal that was being withdrawn in New York, and since Plaintiff already had shown that deal to his attorney, there was no reason for Plaintiff to have his attorney look at this new deal in Florida.

28.     Soon thereafter, Levine sent Plaintiff a plane ticket to Florida and made arrangements for Plaintiff to stay at an upscale hotel in Fort Lauderdale.

29.     Levine met Plaintiff at the airport and proceeded to wine and dine him at fancy restaurants and clubs. Levine even provided Plaintiff with marijuana and encouraged him to enjoy the Florida nightlife. All of Plaintiff's expenses were paid for or "fronted" by Levine or Imperial.

30.     At one point during Plaintiff's stay, Levine arranged for Plaintiff to meet with a woman named Joann Marcus ("Marcus"), who provided Plaintiff with a lease for premises located at 814 S.E. 13th Street, Apartment 4, Ft. Lauderdale, Florida 33316. Plaintiff never set foot in these premises, which are, upon information and belief, owned by Marcus. Levine also arranged for Plaintiff to obtain an identification card using the address on Marcus' property and brought in his own captive Notary Public, a woman named Sharnell Shenekia Spencer, to notarize Plaintiff's signature on allegedly falsified documents. Upon information and belief, Marcus and Sharnell Shenekia Spencer were agents of Imperial.

31.     Levine then instructed Plaintiff to open a bank account and introduced Plaintiff to one of Levine's neighbors who worked at an RBC Bank ("RBC") branch in Fort Lauderdale. While at RBC, Levine gave Plaintiff $100 in cash to open the RBC account. Plaintiff never used this account, which account appears to have been suspiciously closed by someone other than Plaintiff.

32.     Levine then instructed Plaintiff to sign forms where indicated and told Plaintiff he was doing the same transaction he previously sought to do in New York. Plaintiff did not review all of the documents placed in front of him based on Levine's assurances that "everything was the same as the New York deal".

33.     Plaintiff returned to New York with stored value cards ("gift cards") that were furnished by Levine and/or Imperial and the expectation that he would soon be flush with cash.

34.     In November or December 2011, Levine began emailing Plaintiff pictures of expensive sport cars available for purchase in South Florida.

35.     On December 21, 2011 the 2011 Orange County Petition filed under index number 5151/2011 was withdrawn.

36.     On December 22, 2011 a petition was filed in Sumter County, Florida (the "2011 Florida Transaction") seeking approval for Plaintiff to sell the following payments to Defendants:

(a) monthly payments of $1,000, increasing 3% annually beginning on June 22, 2012 through and including May 22, 2030; annual payments in the amount of $10,000 commencing on June 22, 2012 through and including June 22, 2013; one lump sum of $150,000 due on June 22, 2012; and one lump sum of $253,914 due on June 22, 2026;

(b) monthly payments of $1,500.00, increasing 3% annually commencing on June 22, 2012 through and including May 22, 2030; and

(c) monthly payments of $1,250 increasing 3% annually, commencing on June 22, 2012 through and including May 22, 2030.

37.     Plaintiff returned to Florida just prior to New Year's Eve in 2011 and Levine continued to wine and dine Plaintiff. Levine provided Plaintiff with marijuana upon his arrival at the Florida airport, and drove him by a car dealership with a Maserati for sale.

38.     Just prior to New Year's Eve, Levine told Plaintiff to check his bank account in New York. Plaintiff received approximately $300,000 from Imperial just in time to celebrate the New Year in style. Defendants clearly knew that Plaintiff received money in New York as they wired money to him in New York. A true and correct copy of the Order issued by the Sumter County court dated December 29, 2011 (the "December 2011 Order") is attached hereto and made a part hereof as Exhibit "A".

39.     Plaintiff originally sought funding in the amount of approximately $130,000 to build his hip-hop artist representation business. When Plaintiff asked Levine why he received so much more than he originally sought, he was told that "Florida has better rates than New York". At all times relevant to this transaction, Plaintiff resided and was domiciled in the state of New York.

40.     In fact, the discount rates applied to the December 2011 Order were in excess of 20%, a rate significantly higher than rates that are typically approved in New York. In fact, given that discount rates on approved petitions in New York typically do not exceed 15% and assuming that the transferred payments are rediscounted at 14.99 %, Plaintiff gave up more than $100,000 in present value by consummating the transaction described in the December 2011 Order in Florida as opposed to New York.

41.     Upon information and belief, the December 2011 Order contained three separate counts reflecting three separate contracts whereas Plaintiff understood that he was only entering into one transaction. Upon further information and belief, Defendant Levine concealed from Plaintiff the fact that he was selling more payments in more transactions than he originally understood.

42.     Levine and Marcus encouraged Plaintiff to purchase speculative property in Florida and Levine told Plaintiff that he should wear fancy clothes and drive a fancy car if he wanted to be successful managing hip-hop artists.     Marcus took Plaintiff to see several beachfront condominiums and Levine accompanied Plaintiff to the Maserati dealer and encouraged him to buy a fancy car with his sales proceeds.

43.     Upon information and belief, neither Levine nor Marcus are licensed to give financial advice.

44.     Sometime in January 2012, after receiving funds from Imperial, Plaintiff purchased a Maserati from a dealer introduced by Levine.

45.     In January 2012, Plaintiff purchased a home in Davie, Florida which he ultimately sold at a significant loss.

46.     The Maserati was also sold at an extreme loss.

47.     At some point in June 2013 Plaintiff stopped receiving monthly checks from Allstate. When Plaintiff attempted to reach Levine at Imperial about the cessation of his periodic payments, his calls were ignored. After persistent efforts to reach Levine, Plaintiff finally managed to get Levine to answer his cell phone. Plaintiff asked Levine what happened to his payments and Levine told him that he sold them all and there was nothing left.

48.     Plaintiff asked Levine and Imperial for documents and all of his requests were denied. Plaintiff attempted to discuss the matter with Imperial's legal department and despite his efforts to uncover the truth, Imperial refused to provide Plaintiff with documentation.

49.     At some point in 2014, Plaintiff retained counsel and learned about the following transactions:

- On December 29, 2011, the very day the previous order was entered, a second petition is filed in Sumter County. An Order approving the transfer was issued on January 19, 2012. Payments sold were monthly payments of $790, increasing 3% every June 22, beginning on 6/22/12 through and including 5/22/2030.

- On March 20, 2012 a third petition is filed in Sumter County. An Order approving this petition was issued on April 26, 2012. Payments sold were monthly payments of $2,815.87, increasing 3% every June 22, beginning 6/22/2019 thru and including 5/22/2030, and monthly payments of $11,626.84, increasing 3% every June 22, beginning 6/22/2030 through and including 5/22/2039.

- On June 13, 2012 a fourth Order was issued, this time in Broward County, Florida. Payments sold were monthly payments of $2,289.54, increasing 3% every June 22, beginning on 6/22/2013 through and including 5/22/2019.

50.     According to Plaintiff, he did not authorize, approve or receive any of the funds associated with the three above-mentioned transactions that took place between January and June 2012 (the "2012 Transactions").

51.     Plaintiff only recalls receiving $300,000 from Defendant Imperial in connection with the December 2011 Order.

52.     In fact, the January 19, 2012 transaction allegedly So-Ordered by Judge Morley on January 19, 2012 is implausible on its face and Plaintiff denies having consented to such transaction and further denies having received any proceeds of such transaction.

11

53. It is highly unusual for an individual seller to file a petition to sell additional structured settlement payments on the same day that the first petition is granted, or to consummate two transactions within 3 weeks of one another and for both transactions to comply with state and federal law.

54. It is equally unusual for one seller to consummate four (4) transactions within a six (6) month period resulting in the divestiture of more than $4,000,000 in future periodic payments and for such transactions to comply with state and federal law.

55. It is highly improper to encourage and induce a naïve teenager to fake relocating to Florida for the express purpose of avoiding the New York Transfer Act and IRC § 5891. To solicit a 19 year old, with easy money cash advances, plane tickets, hotel rooms, fancy meals, gifts, marijuana and promises of riches through improvident investments, turns the New York Transfer Act and IRC § 5891 on their respective heads.

56. On January 19, 2012, Plaintiff was a resident of and was domiciled in the State of New York.

57. Plaintiff moved to New Jersey in February, 2013. After his payments ceased in June 2013, Plaintiff had trouble paying his rent and moved in with family in Reading, Pennsylvania in August of 2013 where he resides today.

58. Plaintiff depends upon family members for support. As soon as he is financially able, Plaintiff intends to return to New York.

## CAUSES OF ACTION

## NEGLIGENCE

59. The allegations of this Complaint are re-alleged and incorporated by reference herein.

60. The gifts, drugs, cash advances and the prospect of easy money that Levine and/or Defendants offered Plaintiff are contrary to the Structured Settlement Protection Act, which was enacted to protect recipients of long-term structured settlements from being victimized by companies aggressively seeking acquisition of their rights to guaranteed settlement payments, and includes procedural requirements and judicial review on the substantive merits of each petition.

61. The gifts, drugs, cash advances and the prospect of easy money that Levine and/or Defendants offered Plaintiff are contrary to the alleged "best practices" and standards of conduct adopted by the National Association of Settlement Purchasers ("NASP") the industry trade association. In fact, the following is featured prominently on the NASP website at https://nasp-usa.com/members/criteria:

### 1. **Standards of Conduct**
Business practices that reflect negatively on the secondary market, which are unfair or deceptive, or which attract criticism from courts, legislators, regulators, or participants in the primary market pose a significant threat to the continued viability of the secondary market. Companies, firms, entities, or individuals that engage in these practices are not welcome in NASP and will not be invited to join NASP or to continue their membership.

Specifically, Regular Members must:
- Use their best efforts to comply with all applicable laws, rules, and regulations relative to the secondary market, including applicable federal tax laws and all applicable transfer statutes
- Adhere to NASP's Code of Ethics and the Consumer Bill of Rights
- Comply with the rules for use of the NASP Anti-Fraud Database
- Pay annual dues on time
- Not take or advocate positions or legal theories relative to transfers of structured settlement payments, specifically including legal positions in court or in the general marketplace that conflict with or contradict NASP's positions

62. Upon information and belief, at all times relevant to this Complaint, Imperial was a dues paying member of NASP. Imperial knowingly and recklessly disregarded all of the standards outlined above. Specifically, all Defendants failed to adhere to NASP's Code of Ethics and the Consumer Bill of Rights.

13

63.     Defendants owed Plaintiff a duty of care with respect to their solicitation of him as a customer and such duty includes compliance with applicable state and federal law. Defendants at all times relevant to this action held themselves out as experts in the structured settlement secondary market.

64.     The Florida Transfer Act requires that settlement purchasers adhere to the "best interest" standard described above. In supplying potential customers with sales documentation packages, Defendants are duty bound to provide potential customers like Plaintiff with materials that comply with the requirements of applicable state law and IRC §5891, including the requirement that the transaction be in the customer's best interest.

65.     Defendant's knew or should have known that the transactions consummated from December 2011 to June 2012 were not in Plaintiff's best interest and violated applicable state and federal statutes.

66.     Defendant knew or should have known that Plaintiff resided and was domiciled in New York and that New York would not have approved the transactions described herein. Upon information and belief Defendants actively concealed Plaintiff's residence from the Florida courts, induced Plaintiff to sign falsified documents and knowingly falsified documents to avoid compliance with the New York Transfer Act and IRC §5891.

67.     Defendants held themselves out as secondary market experts and assured Plaintiff that everything they were doing on his behalf, including in Florida, was appropriate and in compliance with all known structured settlement transfer laws, regulations and industry practices.

68.     Plaintiff reasonably relied upon Defendants' representations to his detriment.

69.     By providing Plaintiff with document packages that were falsified, misleading and/or inaccurate, Defendants breached their duty to Plaintiff under all applicable state and federal laws.

70.     In addition to paying for roundtrip airfare to and from Florida in or around November 2011, and Plaintiff's hotel and other expenses, from approximately June 2011 through December 2011, Defendants made several advances to Plaintiff totaling several thousand dollars and mailed Plaintiff multiple gift cards ranging in value from $50-$100.

71.     These advances were predatory, irresponsible and ultimately destructive to Plaintiff. Defendants' conduct was akin to giving a crack addict another vial.

72.     As a result of the aforesaid breaches of the duty of care, Plaintiff has been rendered insolvent in violation of the New York Transfer Act and has been and will be damaged as a result of Defendants' breaches of their duties to Plaintiff, including the loss of his structured settlement payments, and the incurring of liability for attorney fees and expenses.

73.     Defendants helped Plaintiff buy a Maserati and knew that buying the Maserati was not consistent with the petition filed or the best interest standard in New York or Florida law.

74.     Defendants helped Plaintiff buy a property in Florida, and knew this purchase was not in his best interest.

75.     Defendants knew that Plaintiff was depleting the lump sum proceeds in a manner that was clearly and patently not in his best interests, yet Defendants filed three additional application petitions in Florida by June of 2012 to sell more of Plaintiff's structured settlement payments.

76.     Defendants knew that facilitating four separate sales of structured settlement payments within a six month period, effectively wiping out a lifetime of payments, was not in the

best interests of a twenty (20) year old that had monthly payments which would have increased 3% every year for his entire life and would have paid Plaintiff more than $10,000,000 had he lived to 80 years old..

77.     Defendants took specific steps to fraudulently avoid New York transfer laws, including filing papers for the December 2011 Florida transaction that they knew violated the New York and the Florida Transfer Acts, with intent to deceive and for the express purpose of profiting from these illegal transactions, to the grave detriment of Plaintiff.


## GROSS NEGLIGENCE

78.     The allegations of this Complaint are re-alleged and incorporated by reference herein.

79.     Defendants owed Plaintiff a duty of care with respect to their solicitation of him as a customer and such duty includes compliance with applicable state and federal law. Defendants at all times relevant to this action held themselves out as experts in the structured settlement secondary market.

80.     The Florida Transfer Act requires that settlement purchasers adhere to the "best interest" standard described above. In supplying potential customers with sales documentation packages, Defendants are duty bound to provide potential customers like Plaintiff with materials that comply with the requirements of applicable state law and IRC Section 5891, including the requirement that the transaction be in the customer's best interest.

81.     Defendants knew or should have known that the transactions consummated from December 2011 to June 2012 were not in Plaintiff's best interest.

82. Defendant knew or should have known that Plaintiff resided in New York and that New York would not have approved the transactions described herein. Upon information and belief Defendants actively concealed Plaintiff's residence and domicile from the Florida courts, induced Plaintiff to sign falsified documents and knowingly falsified documents to avoid compliance with the New York Transfer Act and IRC § 5891.

83. By providing Plaintiff with document packages that were falsified, misleading and/or inaccurate, Defendants breached their duty to Plaintiff under all applicable state and federal laws.

84. In addition to paying for roundtrip airfare to and from Florida in or around November 2011, and Plaintiff's hotel and other expenses, from approximately June 2011 through December 2011, Defendants made several cash advances to Plaintiff totaling several thousand dollars and provided him with multiple gift cards ranging in value from $50 - $100.

85. These advances were predatory, irresponsible and akin to giving a crack addict another vial.

86. As a result of the aforesaid breaches of the duty of care, Plaintiff has been rendered insolvent in violation of the New York Transfer Act and has been and will be damaged as a result of Defendants' breaches of duty, including the loss of his structured settlement payments, and the incurring of liability for attorney fees and expenses.

87. It was reasonably foreseeable that Plaintiff would be impoverished and otherwise damaged as a result of Defendants wanton, willful and reckless disregard for state and federal law. In fact, the state transfer acts and IRC § 5891 were enacted for the express purpose of avoiding the type of transactions complained of herein.

17

88. As a direct and proximate result of Defendants' gross negligence and wanton, willful and reckless disregard for state and federal law, Plaintiff has suffered actual damages in excess of $4,000,000.

89. Because Defendants gross negligence was wanton, willful and in reckless disregard to state and federal law, punitive damages should also be awarded in an amount to be determined at trial.

## FRAUDULENT MISREPRESENTATION

90. The allegations of this Complaint are re-alleged and incorporated by reference herein.

91. At all times relevant to this action, Defendants represented that they were reputable settlement purchasers willing to offer Plaintiff cash for his future payments in accordance with the law, specifically, IRC § 5891 and the Structured Settlement Protection Act, New York General Obligations law § 5-1701 *et seq.*

92. Defendants knew that a pre-condition to applying for and obtaining a qualified court order within the meaning of IRC § 5891 was a showing that the transaction was in the "best interest" of Plaintiff. In order to get the aforesaid transactions approved, Defendants secured one or more affidavits from Plaintiff setting forth his purported intentions with respect to the payments, his other sources of income and his residence. Defendants prepared for Plaintiff, and coached Plaintiff on how to submit false affidavits so they could profit at Plaintiff's expense. Defendants chose the venues they would use, secured a false lease for Plaintiff and coached and cajoled Plaintiff into faking his relocation to Florida. Defendants made numerous representations to Plaintiff that they knew were false, misleading and destructive and that they knew would be relied upon by Plaintiff to his detriment.

93.     Defendants engaged in a number of specific acts in furtherance of this fraud, including but not limited to the following: soliciting Plaintiff in New York; mailing and wiring information or funds to Plaintiff in New York; phone calls; faxes; emails; and text messages to Plaintiff in New York; convincing Plaintiff to withdraw a petition that had been pending in New York for many months because they wanted to poach him from Peachtree when they knew he was under contract with that company; disregarding the best interest standard; sending stored value cards or cash advance checks to Plaintiff in New York; changing the terms of the December 2011 transaction without informing Plaintiff; failing to send proper Disclosure Notices as required by law; falsifying documents and encouraging Plaintiff to waive independent professional advice; steering Plaintiff into bad investments, including but not limited to a Maserati; and grooming and coaching Plaintiff about how to misrepresent his state of residence.

94.     Upon information and belief, the transactions complained of herein were not isolated instances but rather were part of a deliberate and wrongful pattern of conduct that Defendants engaged in with a number of individuals based upon the size and potential profit they could extract from large structured settlement annuities.

95.     This type of solicitation and targeting is contrary to the NASP Code of Ethics and the spirit and letter of relevant state and federal law, including but not limited to IRC § 5891.

96.     Defendants misled Plaintiff into selling more of his payments than he reasonably required so they could profit at Plaintiff's expense without Plaintiff's knowledge or consent.

97.     Defendants specifically assured Plaintiff that there was nothing improper with taking the transaction from New York to Florida

98. Defendants told Plaintiff that he would make tons of money investing the proceeds of his tax free structured settlement in Florida real estate, dispensing financial advice without an appropriate license.

99. Upon information and belief Defendants and /or Defendants' agents benefited from Plaintiff's investment in Florida real estate

100. Defendant knew and specifically intended for Plaintiff to rely on the aforesaid misrepresentations to his detriment.

101. Accordingly, Defendants should be required to pay damages for fraudulent misrepresentation in an amount believed to be in excess of four million dollars ($4,000,000) plus punitive damages, attorneys' fees and the costs associated with this action.

## FRAUD

102. The allegations of this Complaint are re-alleged and incorporated by reference herein.

103. Defendants specifically misrepresented to Plaintiff that there was nothing improper with stopping the pending 2011 Orange Country Petition, and initiating a new petition in Florida.

104. Defendants knew that Plaintiff had specific needs for money flowing from a business plan that called for approximately $110,000 to start a business.

105. Defendants knew that Plaintiff had counsel help him both with developing the business plan and with reviewing the deal with Peachtree to sell a portion of his structured settlement payments to raise that $110,000.

106. Defendants knew that Plaintiff only wanted to sell enough payments to cover the needs of starting his new business venture.

20

107.     Defendants misrepresented to Plaintiff that Defendants' plan to bring Plaintiff to Florida to establish residency for purposes of filing a petition in Florida was legal even though Defendants knew Plaintiff was domiciled in New York in November and December of 2011.

108.     Defendants knew that Plaintiff did not occupy the premises of lease they arranged for him, and was not planning on occupying those premises.

109.     Defendants specifically misrepresented to Plaintiff that the deal he would get in Florida would be better than the deal he could get in New York, even though Defendants knew that the significantly higher interest rate they charged Plaintiff to sell some of his structured settlement payments in Florida would result in Plaintiff receiving substantially less, not more money than Plaintiff would have received in New York.

110.     Defendants intentionally misled Plaintiff into selling his payments in Florida because Defendants profited more than $100,000 from the 2011 Florida Transaction than they would have from the 2011 Orange Country Petition.

111.     Defendants misled Plaintiff into selling more of his payments than he reasonably required so they could profit at Plaintiff's expense without Plaintiff's knowledge or consent.

112.     Defendant knew and specifically intended for Plaintiff to rely on the aforesaid misrepresentations to his detriment.

113.     Plaintiff did reasonably rely on Defendants many representations to his detriment, losing more of his structured settlement payments than he intended to sell, and at a discount rate that yielded much less money from the 2011 Florida Transaction than he would have received through the 2011 Orange County Petition, absent these misrepresentation.

114.    Accordingly, Defendants should be required to pay damages for their fraud in an amount believed to be in excess of four million dollars ($4,000,000) plus punitive damages, attorneys' fees and the costs associated with this action.

## FRAUD AS TO THE 2012 FLORIDA TRANSACTIONS

115.    The allegations of this Complaint are re-alleged and incorporated by reference herein.

116.    On December 29, 2011, the same day that a judge in Florida approved the 2011 Florida Transaction, Defendants filed another petition with the same judge to sell more of Plaintiffs structured settlement payments without the knowledge or consent of Plaintiff.

117.    Plaintiff had just received the money that he needed to start his business and had no interest in selling more of his payments, and Plaintiff would not have agreed to the petition that Defendants falsely filed on his behalf.

118.    Defendants kept Plaintiff in the dark about the petition that Defendants filed on December 29th, seeking neither his approval nor his consent, misrepresenting to the Sumter County judge that the December 29th petition was filed on behalf of Plaintiff.

119.    Defendants concealed from Plaintiff the fact that the Sumter County Court issued an Order on January 19, 2012 approving the petition selling Plaintiff's monthly payments of $790, increasing 3% every June 22, beginning on June 22, 2012 through and including May 22, 2030.

120.    Defendants not only concealed this first 2012 Florida Transaction from Plaintiff prior to its consummation, and after the transaction's completion, Defendants also withheld from Plaintiff all of the proceeds from the transaction

121.     On March 20, 2012, Defendants filed yet another petition in Sumter County, again without Plaintiffs knowledge or consent, again misrepresenting the fact of that consent to the Court.

122.     On April 26, 2012, the Sumter County court issued an Order approving the petition to sell monthly payments of $2,815.87, increasing 3% every June 22, beginning June 22, 2019 through and including May 22, 2030, and monthly payments of $11,626.84, increasing 3% every June 22, beginning June 22, 2030 through and including May 22, 2039.

123.     Defendants again concealed this second 2012 Florida Transaction from Plaintiff prior to its consummation, and after its completion, withholding from Plaintiff all of the proceeds from the transaction.

124.     Soon after, Defendants filed a third petition without Plaintiff's knowledge or consent, this time at a different courthouse in Broward County, Florida. Defendants concealed the filing of this petition from Plaintiff, and misrepresented Plaintiffs' knowledge and consent to the Broward County court.

125.     On June 13, 2012 the Broward County Circuit Court issued an Order approving the petition to sell monthly payments of $2,289.54, increasing 3% every June 22, beginning on June 22, 2013 through and including May 22, 2019.

126.     Defendants again concealed this third 2012 Florida Transaction from Plaintiff prior to its consummation, and after its completion, withholding from Plaintiff all of the proceeds from the transaction

127.     Defendants knowingly filed materially false petitions for all three 2012 Florida Transactions, misleading two courts into granting petitions that Plaintiff never made, in reliance on those falsehoods.

23

128.     As a direct result of Defendants material misrepresentations to two courts and their reliance on those misrepresentations, Plaintiff suffered the utter and complete loss of his entire economic future. Defendants sold all of his remaining structured settlement payments without his knowledge or consent, and without giving Plaintiff any of the compensation due from those 2012 Florida Transactions

129.     Defendants took numerous specific steps to fraudulently avoid New York transfer laws, including filing papers for the 2012 Florida Transactions that they knew violated the New York and Florida Transfer Acts, with intent to deceive and solely to profit from these illegal transactions, to the grave detriment of Plaintiff.

130.     Wherefore, Plaintiff petitions this court for a Declaration finding that the 2012 Florida Transactions were procured by fraud, that Plaintiff received none of the benefits from these transactions, and ordering that the 2012 Florida Transactions shall be set aside, with the structured settlement payments taken via the 2012 Florida Transactions restored to Plaintiff, and further directing Defendant Imperial to take all steps to rescind the transactions and restore Plaintiff's benefits, with interest, and to pay appropriate penalties, and attorney's fees.


## CONVERSION

131.     The allegations of this Complaint are re-alleged and incorporated by reference herein.

132.     One or all of the Defendants herein intentionally and without authority assumed control over Plaintiff's structured settlement payment rights. Plaintiff had the sole right to receive all of the payments that were allegedly transferred to Defendant Imperial in connection with the 2012 Florida Transactions.

133. By interfering with Plaintiff's rights to the structured settlement payments described above in derogation of Plaintiff's exclusive rights, Defendant Imperial converted Plaintiff's property for its own use without authorization. Due demand for the return of Plaintiff's property has been made and Defendant Imperial has not returned the payments to Plaintiff.

134. Accordingly, Defendant Imperial should be required to pay damages to Plaintiff of at least $1,529,597.10 which represents the present value of the 2012 Florida Transactions in accordance with 26 U.S.C.A. §7520, plus interest and punitive damages for conversion in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment against Defendants as follows:

A. General and compensatory damages according to proof at trial;

B. Punitive damages for fraud and conversion;

C. Declarations that:
   i. Defendants breached their duties to Plaintiff;

   ii. the 2012 Florida Transaction were procured by fraud;

   iii. Plaintiff received none of the benefits from the 2012 Florida Transactions;

   iv. The 2012 Florida Transaction shall be set aside, with all structured settlement payments taken via the 2012 Florida Transactions restored to Plaintiff,

   v. and further directing Defendant Imperial to take all steps to rescind the transactions and restore Plaintiffs' benefits, with interest, and to pay appropriate penalties and attorneys' fees;

      vi.     Defendants have breached their duties to Plaintiff;

      vii.    The January, April and May transactions are to be rescinded at Defendant's expense;

      viii.   Defendants must indemnify Plaintiff for its losses, costs, fees, and expenses including attorneys' fees and an order directing same.

D.   Disgorgement of commissions, compensation, fees, and other payments made to Defendant Levine;

E.   Disgorgement of all profits received by Defendants or earned by Defendants as a result of their misconduct towards Plaintiff;

F.   An award of Plaintiff's reasonable attorneys' fees and costs and expenses; and

G.   Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury in this action of all issues so triable, and pays the requisite jury fee concurrent with the filing of this Complaint.

DATED this 15th day of December 2014.

Edward S. Stone (ESS 2247)
EDWARD STONE LAW, P.C.
305 Broadway, Suite 1001
New York, NY 10007
(203) 504-8425

*Attorneys for Plaintiff*

EXHIBIT A

/

/¢

## IN THE CIRCUIT COURT OF SUMTER COUNTY, STATE OF FLORIDA

IN RE:                                                Case No. 2011CA000 1603

APPROVAL FOR TRANSFER OF STRUCTURED
SETTLEMENT PAYMENT RIGHTS
BETWEEN WASHINGTON SQUARE FINANCIAL, LLC
d/b/a IMPERIAL STRUCTURED SETTLEMENTS.

*Petitioner,*

AND

MICHAEL LAFONTANT,

*Respondents.*
_____/

## ORDER APPROVING TRANSFER OF
## STRUCTURED SETTLEMENT PAYMENT RIGHTS

AND NOW, upon consideration of the unopposed petition of Washington Square

Financial, LLC d/b/a Imperial Structured Settlements ("Imperial"), and upon consideration of the

court order attached hereto as Exhibit "A" approving the underlying structured settlement, the

Court hereby finds as follows:

1.    The transfer of the structured settlement proceeds: specifically,

   (a)   Count One.

   - monthly payments of $1,000.00, increasing 3% every June 22nd, commencing on June 22, 2012 through and including May 22, 2030; annual payments each in the amount of $10,000.00, commencing on June 22, 2012 through and including June 22, 2013; one lump sum payment of $150,000.00 due on June 22, 2021; and one lump sum payment of $253,914.00 due on June 22, 2026;

   *=216,000*
   *20,000*
   *150,000*
   *253,914*
   *$639,914*

   (b)   Count Two:

   - monthly payments of $1,500.00, increasing 3% every June 22nd, commencing on June 22, 2012 through and including May 22, 2030; *324,000*
   and

   (c)   Count Three:

The 201160071113 Book: 2393 Page: 540 Date: 12/30/2011 ... Broward Sumter Court, Page 7 of 14 ... 2:29:16 PM

- monthly payments of $1,250.00, increasing 3% every June 22nd, commencing on June 22, 2012 through and including May 22, 2030 $270,000

(collectively, the "Assigned Payments"), by Michael Lafontan: a/k/a Michael LaFontant ("Mr.
LaFontant") to Imperial as described in the petition in this matter and in the three Absolute Sale $1233,914
and Security Agreements (collectively, the "Purchase Agreement") between Mr. LaFontant and
Imperial (the "Proposed Transfer") (i) does not contravene any federal or state statute or the
order of any court or responsible administrative authority, and (ii) is in the best interest of Mr.
LaFontant, taking into account the welfare and support of Mr. LaFontant's dependents, if any,
and the transaction, including the discount rate used to determine the gross advance amount and
the fees and expenses used to determine the net advance amount, is fair and reasonable.

2. At least ten (10) days before the date on which Mr. LaFontant first incurred an
obligation with respect to the Proposed Transfer, Imperial provided to Mr. LaFontant separate
disclosure statements meeting the requirements of Fla. Stat. § 626.99296(3)(a)(2) (collectively,
the "Florida Disclosure"). Disclosure statements were also provided to Mr. LaFontant in
compliance with N.Y. Gen. Oblig. § 5-1703. The Florida Disclosure was prepared in bold type,
no smaller than 14 points, and set forth:

    (a)    the amounts and due dates of the structured settlement payments to be
        transferred;

    (b)    the aggregate amount of the payments;

    (c)    the discounted present value of the payments, together with the discount
        rate used in determining the discounted present value;

    (d)    the gross amount payable to Mr. LaFontant in exchange for the payments;

    (e)    an itemized listing of all brokers' commissions, service charges,
        application fees, processing fees, closing costs, filing fees, referral fees,
        administrative fees, legal fees, and notary fees and other commissions,
        fees, costs, expenses, and charges payable by Mr. LaFontant or deductible
        from the gross amount otherwise payable to Mr. LaFontant;

KLITTINGEL HTTL: DrawTOuk Unit Pome 2/ Ku1 W.
1/2011 glash Heswarch number bounty charge + at 1=14, show =41

(f)     the net amount payable to Mr. LaFontant after deducting all commissions, fees, costs, expenses, and charges described in sub-paragraph (e);

(g)     the quotient, expressed as a percentage, obtained by dividing the net payment amount by the discounted present value of the payments, which must be disclosed in the following statement: "The net amount that you will receive from us in exchange for your future structured settlement payments represents 26.21 and 16.40 percent [Count One], 26.17 percent [Count Two], and 26.03 percent [Count Three] of the estimated current value of the payments based upon the discounted value using the applicable federal rate";

(h)     the effective annual interest rate, which must be disclosed in the following statement: "Based on the net amount that you will receive from us and the amounts and timing of the structured settlement payments that you are turning over to us, you will, in effect, be paying interest to us at a rate of 20.29 and 20.19 percent [Count One], 20.40 percent [Count Two], and 20.50 percent [Count Three] per year"; and

(i)     the amount of any penalty and the aggregate amount of any liquidated damages, including penalties, payable by Mr. LaFontant in the event of a breach of the Purchase Agreement by Mr. LaFontant.

3.     Mr. LaFontant has received, or waived his right to receive, independent

professional advice regarding the legal, tax, and financial implications of the Proposed Transfer.

4.     Imperial has given timely written notice of its name, address, and taxpayer

identification number to the annuity issuer, Allstate Life Insurance Company of New York

("Allstate Life NY"), and the structured settlement obligor, Allstate Settlement Corporation

(collectively, "Allstate"), and has filed a copy of the notice with the Court.

5.     Notice of the Proposed Transfer and the petition for its authorization has been

filed with this Court and served on all interested parties in compliance with Fla. Stat. §

626.99296(4).

6.     The net amount payable to Mr. LaFontant is fair, just, and reasonable under the

present circumstances.

I-A J r-a'z'- r- 's- r'- eq- u- 12/30/201 t Time: 1 To PM
JC is a R -Powere Sumter County Page 4u re 5, 40 R 24

7.   Mr. LaFontant has established that the Proposed Transfer is in his best interest, taking into account the welfare and support of his dependents, if any.

8.   The Proposed Transfer complies with Fla. Stat § 626.99296, Gen. Oblig. § 5-1701 *et seq.*, and 26 U.S.C. § 5891, and does not contravene other applicable law.

9.   The Purchase Agreement and all disclosures are written in plain language and in compliance with N.Y. Gen. Oblig. § 5-1702.

10.   The Purchase Agreement between Mr. LaFontant and Imperial provides that if Mr. LaFontant is domiciled in Florida, any disputes between the parties will be governed in accordance with the laws of Florida and that the domicile state of Mr. LaFontant is the proper venue to bring any cause of action arising out of a breach of the Purchase Agreement.

11.   The Court has jurisdiction over this matter and the laws of the State of Florida apply and govern this matter.

Based upon the foregoing findings, IT IS HEREBY ORDERED that:

1.   Pursuant to Fla. Stat. § 626.99296(3)(a), the Proposed Transfer is approved. Until the due date of the last Assigned Payment, the designated beneficiary under annuity contract nos. 95006432 and 95006433 shall be the estate of Mr. LaFontant. However, the Assigned Payments shall be made to Imperial's designated assignee, Imperial Settlements Financing 2010, LLC ("ISF 2010"), even in the event of Mr. LaFontant's death, and Mr. LaFontant understands he is giving up his rights, and the rights of his heirs, successors and/or beneficiaries, to the Assigned Payments

2.   Allstate Life NY shall forward the Assigned Payments, within 7 days of the date due, to Imperial's designated assignee, ISF 2010, by check made payable to "Imperial Settlements Financing 2010, LLC," at P.O. Box 116158, Atlanta, GA 30368-6158 (the "Designated Address"), as follows: monthly payments of $3,750.00, increasing 3% every June

22nd, commencing on June 22, 2012 through and including May 22, 2030; annual payments each in the amount of $10,000 00, commencing on June 22, 2012 through and including June 22, 2013; one lump sum payment of $150,000.00 due on June 22, 2021; and one lump sum payment of $253,914.00 due on June 22, 2026.

3.       ISF 2010 is authorized to make subsequent assignments or transfers of the Assigned Payments (a "Reassignment") except that, regardless of any such Reassignment, the Assigned Payments will continue to be serviced by ISF 2010 (or an agent on its behalf). In other words, the Assigned Payments will continue to be made by Allstate to ISF 2010 at the Designated Address only, regardless of any Reassignment. However, if for reasons beyond the control of ISF 2010, or due to ISF 2010 being merged with or acquired by another entity, or for traditional address change purpose the Designated Address is no longer valid (*i e*, if ISF 2010 moves or for other reasons the Designated Address is no longer a viable address for ISF 2010 to receive payments), Allstate agrees to make the Assigned Payments to a new address. Notwithstanding the foregoing, this Order and the parties' Stipulation ("Stipulation") will remain binding and fully enforceable against ISF 2010, Imperial, and Mr. LaFontant.

4.       All remaining structured settlement payments (and/or portions thereof), including but not limited to the balance of each monthly structured settlement payment commencing on June 22, 2012 through and including May 22, 2030, that are not the subject of the Proposed Transfer and not previously assigned, shall be made payable to Mr. LaFontant and will be forwarded by Allstate Life NY, when due, to Mr. LaFontant's most recent known address or any payment address designated by Mr. LaFontant, subject to Allstate's consent.

5.       Imperial, for itself and on behalf of ISF 2010, shall defend, indemnify, and hold harmless Allstate and its directors, shareholders, officers, agents, employees, servants,

ms 20116071113 Date 1, 30-2011 Time 2, 29 PM
Leon, Al Boone Browerd-Summer County Page 6 of 14 B 2393 P 544

successors, and assigns, and any parent, subsidiary, or affiliate thereof, and their directors, shareholders, officers, agents, employees, servants, successors, and assigns, past and present, from and against any and all liability, including but not limited to costs and reasonable attorneys' fees, for any and all claims asserted by any person or entity, including but not limited to any claims asserted by any person or entity not a party hereto, claiming an interest in the Assigned Payments, and any and all other claims made in connection with, related to, or arising out of the Purchase Agreement, the Proposed Transfer, the Assigned Payments, any Reassignment, or Allstate's compliance with the parties' Stipulation or this Order, except with respect to claims by Imperial against Allstate to enforce Allstate's obligations to Imperial and ISF 2010 under the parties' Stipulation. To the extent Imperial fails to honor this indemnification and defense obligation within thirty (30) days of presentation to Imperial of documentation describing the related liability of Allstate in reasonable detail, Allstate may, in addition to all other remedies afforded by law, satisfy the same by withholding to its own credit any remaining Assigned Payments.

6.    Allstate's lack of opposition to this matter, or its or the other parties' stipulation hereto or compliance herewith, shall not constitute evidence in this or any matter, and is not intended to constitute evidence in this or any matter, that:

(a) payments under a structured settlement contract or annuity or related contracts can be assigned or that "anti-assignment" or "anti encumbrance" provisions in structured settlement contracts or annuities or related contracts are not valid and enforceable; or

(b) other transactions entered into by Imperial and/or ISF 2010 and their customers constitute valid sales and/or loans; or

(c) Allstate has waived any right in connection with any other litigation or claims; or

(d) Imperial or ISF 2010 has waived any right other than as expressly set forth in the parties' Stipulation and/or this Order.

7. Imperial, ISF 2010, and Mr. LaFontant, for themselves and for their respective directors, shareholders, officers, agents, employees, servants, successors, heirs, beneficiaries, contingent beneficiaries, executors, administrators, and assigns, and any parent, subsidiary, or affiliate thereof, and their directors, shareholders, officers, agents, employees, servants, successors, and assigns, past and present (the "Releasors"), hereby remise, release, and forever discharge Allstate and its directors, shareholders, officers, agents, employees, servants, successors, and assigns, and any parent, subsidiary, or affiliate thereof, and their directors, shareholders, officers, agents, employees, servants, successors, and assigns, past and present (the "Allstate Releasees"), of and from any and all manner of actions and causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, agreements, judgments, settlements, damages, claims, and demands whatsoever, in law or in equity, in connection with, related to, or arising out of any claim or allegation that was or could have been asserted in connection with, related to, or arising out of the Purchase Agreement, the Assigned Payments, any Reassignment, the Proposed Transfer, or the parties' Stipulation, which the Releasors have or had from the beginning of the world through the date of this Order, except for claims of the Releasors against the Allstate Releasees to enforce the Allstate Releasees' obligations to the Releasors, if any, under the parties' Stipulation.

AND IT IS SO ORDERED this _____ day of December, 2011.

_Michelle T. Morley_
JUDGE

EXHIBIT A

JUL 8'96 15:06                                          185276954      P 22

At a Surrogate's Court of the State
of New York held in and for the
County of Rockland, at 1 South Main
Street, New City, New York, on June
25, 1996.

P R E S E N T:

HON. ALFRED J. WEINER

-----------------------------------X
In the Matter of the Application of
SIMONE LAFONTANT, as Administratrix of
the Goods, Chattels and Credits which
were of                                        Index No. 644/94

GISELENE LAFONTANT,                            ORDER

Deceased.

For leave to compromise a certain cause
of action for wrongful death of the
decedent and to render and have
judicially settled an account of the
proceedings as such Administratrix.

-----------------------------------X

Upon the Petition of SIMONE LAFONTANT, as Administratrix of

the Goods, Chattels and Credits which were of GISELENE LAFONTANT,

deceased, duly verified the 19th day of April, 1996, and the

accounting sworn to the 19th day of April, 1996, in which

application was made for an Order permitting the said SIMONE

LAFONTANT, as Administratrix, to compromise and settle for the sum

of ONE MILLION SEVEN HUNDRED THOUSAND ($1,700,000.00) DOLLARS, the

cause of action against defendants SIDNEY O. VEITCH, M.D. and

MELINDA CARIELLO, C.P.N. for the wrongful death of the decedent,

GISELENE LAFONTANT, of which the defendant SIDNEY O. VEITCH, M.D.,

is to pay One Million Two Hundred Thousand Dollars

($1,200,000.00), of the aforementioned sum, and defendant MELINDA

CARIELLO, C.P.N., is to pay Five Hundred Thousand Dollars ($500,000.00), of the aforementioned sum,; and to discontinue the action for conscious pain and suffering and to discharge and release said defendants and their insurance companies from all suits and claims upon the payment of the said $1,700,000.00 in settlement of the cause of action herein; and, to discontinue all causes of action against defendants GYNECARE, IRWIN M. SCHER, M.D., IRWIN M. SCHER, M.D., P.C., PATRICIA ABATO and DOTTIE WERNER; and that the entire recovery of said action should be allocated to the cause of action for decedent's wrongful death, to modify the Letters of Administration to permit said compromise, dispense with the filing of a bond, judicially settle the account, pay to JULIEN & SCHLESINGER, P.C., their fee for services rendered and disbursements, pay statutory commissions to the Administratrix, reject the claim of the Department of Social Services, reject the claim of Triumph Pet Industries, Inc. and reject the claim of Good Samaritan Hospital,

And upon the affidavits of Stuart A. Schlesinger, Esq., duly sworn to the 18th day of April, 1996, the 25th day of April 1996, and the 30th day of April 1996, in support thereof

And upon the report of the Guardian Ad Litem, Morton B. Silberman, Esq., dated the 16th day of May, 1996,

And upon the Interim Order of this Court, dated the 22nd day of April, 1996,

And upon the Stipulation & Order of this Court, dated the 4th day of June, 1996,

And upon the application of petitioner's counsel, with the

JUL 8'96 15:07 F                                   TD_16:185276954      P.04

recommendation and consent of the Guardian Ad Litem, the Court having "determined .that the interest of the sole infant distributee, MICHAEL LAFONTANT, would be best served by ensuring that the monies offered in settlement of the claims be received and that an annuity be purchased for the sum of One Million Dollars ($1,000,000.00) and that the balance of Seven Hundred Thousand Dollars be held in escrow by Julien & Schlesinger, P.C. in an attorneys' escrow account pending a further order of this Court,

And, the sum of Five Hundred Thousand Dollars ($500,000.00) of the aforementioned sum, having been paid on behalf of defendant Cariello, and deposited in an attorneys' escrow account of Julien & Schlesinger, P.C., in full compliance with the prior order of this Court,; it is

ORDERED, that SIMONE LAFONTANT, as Administratrix, be and she hereby is authorized to settle and compromise the action originally brought in the Supreme Court of Rockland County, as against defendants GYNECARE, IRWIN M. SCHER, M.D., IRWIN SCHER, M.D., P.C., SIDNEY O VEITCH, M.D., MELINDA CARIELLO, C.P.N., PATRICIA ABATO and DOTTIE WERNER, for the total sum of One Million Seven Hundred Thousand Dollars ($1,700,000.00), of which the defendant SIDNEY O VEITCH, M.D., is to pay One Million Two Hundred Thousand Dollars ($1,200,000.00), of the aforementioned sum, and defendant MELINDA CARIELLO, C.P.N, is to pay Five Hundred Thousand Dollars ($500,000.00), of the aforementioned sum, ~~and this sum shall be paid directly to Simone Lafontant as~~ ~~Administratrix of the estate of Michael Lafontant individually~~ the allocation between the causes of action and distribution shall be determined upon further order of the court, and it is further

                            [illegible fax footer text]

JUL 8'96 15:08 F                                    TO=16:052766954    P. 05

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxkix
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

ORDERED, that SIMONE LAPONTANT, as Administratrix, be and she
hereby is authorized and permitted to deliver any and all papers
necessary, including releases in order to effectuate the
settlement, and it is further

ORDERED, ADJUDGED AND DECREED, that the settlement monies to
be paid by Medical Liability Mutual Insurance Company, the insurer
of defendant SIDNEY O. VEITCH M.D., to wit the sum of One Million
Dollars and 00/100 ($1,000,000.00), is to be paid to Allstate
Settlement Corporation, a corporation licensed to do business in
New York, for the purchase of an annuity as set forth in the
illustration annexed hereto, for the sole benefit of MICHAEL
LAPONTANT, and it is further

ORDERED, ADJUDGED AND DECREED, that the settlement monies to
be paid by Medical Malpractice Insurance Association, the excess
insurer of defendant SIDNEY O. VEITCH, M.D., to wit the sum of Two
Hundred Thousand Dollars and 00/100 ($200,000.00), is to be paid
to Julian & Schlesinger, P.C., as escrow agent, to be held in
escrow in an attorneys' escrow account, pending a further order of
this Court, and it is further

ORDERED, ADJUDGED AND DECREED, that upon payment of the
forgoing monies, the defendants are discharged from all further
liability in accordance with and pursuant to the settlement
herein, and it is further

ORDERED, ADJUDGED AND DECREED that the giving of a bond or
other security in connection therewith be dispensed with at this

10/25/2010 10:43:28 AM  PAGE  6/007  Fax Server

JUL 8'96 15:08 5                         ID▬16105276954    P.06

time and that the restrictions on the Letters of Administration be

modified to allow the above settlement.

Consented to:

Morton B. Silberman, Esq.
Guardian Ad Litem

Surrogate

** TOTAL PAGE.005 **

10/25/2010 10:43:28 AM PAGE 7/007 Fax Server

| SETTLEMENT ANNUITY<br>PACKAGE ILLUSTRATIONS<br>FOR MICHAEL LAFONTANT | | July 9, 1996<br>Page 1 of 1 |
|---|---|---|
| DESCRIPTION OF BENEFITS | | YIELD* GUARANTEE** |
| ILLUSTRATION NO. 1 | | |
| Life Annuity with 30 years<br>payments guaranteed in the event<br>of the premature death providing<br>$6,250 per month, increasing<br>by 3% compounding annually, first<br>payment commencing on 06/22/09 | | 10,979,128 $3,568,156 |
| Lump Sum Payments for MICHAEL: | | |
| $ 40,000 on 06/22/09 | | $40,000 $40,000 |
| $ 40,000 on 06/22/10 | | $40,000 $40,000 |
| $ 40,000 on 06/22/11 | | $40,000 $40,000 |
| $ 40,000 on 06/22/12 | | $40,000 $40,000 |
| $ 40,000 on 06/22/13 | | $40,000 $40,000 |
| $ 100,000 on 06/22/16 | | $100,000 $100,000 |
| $ 150,000 on 06/22/21 | | $150,000 $150,000 |
| $ 253,914 on 06/22/26 | | $253,914 $253,914 |
| | | $703,914 $703,914 |
| TOTAL SETTLEMENT PACKAGE | | 11,683,042 $4,272,070 |

* Yield figures are based on life expectancy to 75 years.

** Portion of the annuity guaranteed in the event of premature death.

THE
PENSION
COMPANY