**UNITED STATES DISTRICT COURT FOR
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL LAFONTANT,<br><br>                      Plaintiff,<br><br>       v.<br><br>WASHINGTON SQUARE FINANCIAL,<br>LLC d/b/a IMPERIAL STRUCTURED<br>SETTLEMENTS, IMPERIAL FINANCE &<br>TRADING, LLC;<br>IMPERIAL HOLDINGS INC.; and<br>ANDREW LEVINE<br><br>                      Defendants. | Case No. 14-CIV-9895<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## NATURE OF THE CASE

Plaintiff brings this action to seek redress for Defendants' egregious scheme to defraud Plaintiff out of millions of dollars in periodic payments due to Plaintiff under a structured settlement annuity.  Defendants preyed upon and took advantage of Plaintiff, made material and fraudulent misrepresentations to Plaintiff, and caused Plaintiff to lose all of the tax free benefits and protections that were built into the settlement agreement reached in connection with the traumatic wrongful death of Plaintiff's mother.   Defendants convinced Plaintiff to abandon a transfer petition pending in Orange County, NY that would have sold a small portion of his guaranteed payments. Then, within a span of less than six months, Defendants managed to prepare and file three knowingly falsified and misleading petitions with a Sumter County, Florida court and one transaction with a Broward County, Florida court that were not in Plaintiff's best interests, resulting in suspect structured settlement payment rights transfers in excess of $3,700,000 to Defendants or their agents.  Never once did Plaintiff appear in court in Sumter County or Broward County and, upon information and belief, Defendants knew that they could get the aforesaid petitions granted in Florida even though Plaintiff resided in and was domiciled in New York, was solicited in New York, and even had a transfer petition filed and pending in New York while Defendants orchestrated his "relocation" to Florida.

Defendants also urged Plaintiff not to have his New York lawyer review the Florida petition because "it was the same" as the pending New York petition they convinced him to abandon.  Defendants knew this claim was completely untrue, as they injected into the Florida petition an arbitration provision that was not in the New York petition, and which violated New York law.  Defendants also put a new discount rate into the Florida petition that was much higher than contained within the New York petition, meaning Plaintiff received far less money, and

included more of Plaintiff's structured settlement payments than were included in the pending New York deal. None of the aforesaid Florida petitions met the "best interest" standard outlined in Fla. Stat. § 626.99296 (the "Florida Structured Settlement Protection Act") nor did they comply with the spirit or letter of New York law, Florida law or Internal Revenue Code § 5891.

Plaintiff's allegations herein are made upon information and belief, except those allegations which are alleged upon personal belief. The facts herein are alleged in their totality and in the alternative. Certain of the facts supporting the allegations contained herein are known only by one or more of the Defendants or their agents, or are exclusively within their custody and control. Further, in some instances the real identities of the actual entities or individuals acting on behalf of these entities are only known to certain Defendants. Plaintiff believes that further substantial evidentiary support for some of the allegations in this Complaint will become available after a reasonable opportunity for discovery.

## PARTIES

1.      Plaintiff Michael Lafontant is an individual who resided in and was domiciled in the State of New York at all times relevant to the transactions.

2.      Defendant Imperial Holdings Inc., is a corporation organized under the laws of the State of Florida with offices at The Plaza, 5355 Town Center Road, Suite 701, Boca Raton, Florida 33486 and through its subsidiaries operates a specialty finance company that at all times relevant to this Complaint purchased payment rights arising out of structured settlement annuities.

3.      Defendant Imperial Finance & Trading, LLC is a limited liability company organized under the laws of the State of Florida, with a principal office at The Plaza, 5355 Town Center Road, Suite 701, Boca Raton, Florida 33486.

4.     Defendant Washington Square Financial, LLC is a limited liability company organized under the laws of the State of Georgia, with a principal address at The Plaza, 5355 Town Center Road, Suite 701, Boca Raton, Florida 33486.

5.      All of the above named corporate Defendants are affiliates and shall, at times, be collectively referred to as "Imperial".

6.     Upon information and belief, Andrew Levine ("Levine") is an individual who at all times relevant to the Complaint either was an employee or agent of Settlement Funding LLC or Imperial and is currently a resident of the State of Florida.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action based on diversity of citizenship, pursuant to 28 U.S.C. § 1332.  Plaintiff is a lifetime New Yorker who currently resides in Reading, Pennsylvania with relatives who agreed to provide for him as a result of the actions complained of herein.  He intends to return to New York once he can afford to do so.  Defendants, other than Washington Square Financial, LLC, are all citizens of the State of Florida. Washington Square Financial, LLC is a Georgia Limited Liability Company that is affiliated with the other Defendants and maintains an office in the State of Florida.

8.     Venue is proper in this District, pursuant to 28 U.S.C. §1391(a) (2) in that a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

## BACKGROUND

9.     In or about June 1996, when Plaintiff Michael Lafontant ("Lafontant") was four years old, he received a structured settlement annuity in connection with the settlement of a wrongful death case involving his mother, Giselene Lafontant.  The terms of his structured settlement are set forth below:

A life annuity with guaranteed payments for 30 years was purchased on behalf of the Plaintiff from Allstate Life Insurance Company of New York.  The structured settlement called for the following periodic payments to Plaintiff:

- $6,250 per month for life, increasing 3% annually, with first payment on 6/22/09, plus lump sums of:

- $40,000 on 6/22/09

- $40,000 on 6/22/10

- $40,000 on 6/22/11

- $40,000 on 6/22/12

- $40,000 on 6/22/13

- $100,000 on 6/22/16

- $150,000 on 6/22/21

- $253,914 on 6/22/26

10.     The aforementioned payments were intended to be entirely tax free to Plaintiff and were designed to compensate Plaintiff for the loss of his mother. These payments were enough to provide Plaintiff with sufficient risk free funds to cover basic needs, and then some, for the remainder of his natural life.  For example, by 2030, the settlement would have paid Plaintiff $11,626.84 per month, and would have continued to increase at a 3% per annum rate until his death.

11.     In or about October, 2010, one Andrew Levine ("Levine") solicited Plaintiff on behalf of a company known as Settlement Funding, LLC. ("Settlement Funding").

12.     Upon information and belief, Settlement Funding is an affiliate of a national brand structured settlement factoring company known as "Peachtree".

4

13.     Mr. Levine befriended Plaintiff, a naïve 19 year old young man, who desired to sell a small portion of his structured settlement payments in order to pay speeding tickets, attorneys' fees for a criminal case against a family member for theft, his car loan, a personal loan, and tuition at community college.

14.     On or about October 8, 2010 Settlement Funding filed a petition in New York's Orange County Supreme Court (the "2010 Orange County Petition") pursuant to New York General Obligations Law § 5-1701, *et seq.* (the "New York Structured Settlement Protection Act") seeking to purchase certain payments from Plaintiff.

15.     At the time the 2010 Orange County Petition was filed, Plaintiff resided at 12 Redwood Drive, Highland Mills, NY 10930.

16.     According to the Order issued on January 6, 2011 Plaintiff sold three lump sum payments in the amount of $30,000 each due on June 22, 2011, June 22, 2012, and June 22, 2013; and one lump sum payment of $100,000 due to him on June 22, 2016 to Settlement Funding for $101,120.86.

17.     In or about early 2011, Levine approached Plaintiff about selling more of his structured settlement payments.

18.     Plaintiff had an interest in selling some of his future periodic payments to fund a hip hop artist representation business he was starting called Flight Life, Inc.

19.     In order to finance this new business, Plaintiff sought the counsel of an entertainment law specialist, came up with a business plan that outlined a need for approximately $110,000 to build the business, and then in connection therewith sought to sell a modest portion of his structured settlement annuity payment rights to raise that amount.

20.     Defendant Levine assured Plaintiff that he could get him a great deal.

21.     On May 23, 2011, Settlement Funding filed a second petition in New York's Orange County Supreme Court (the "2011 Orange County Petition"), seeking to sell 240 monthly payments each in the amount of $1,550 commencing June 22, 2014 through and including May 22, 2034, increasing 3% annually, and $125,000 due on or about June 22, 2026.

22.     In exchange for the sale of the above referenced payments totaling $724,788.97 Plaintiff was to receive $130,000.  According to the disclosures provided to Plaintiff the discount rate for this transaction was 15.35%.

23.     At the time the 2011 Orange County Petition was filed, Plaintiff resided at 12 Redwood Drive, Highland Mills, NY 10930.

24.     Even though Plaintiff desired to sell a portion of his payments to finance his entertainment business, on several occasions Judge Lawrence H. Ecker, presiding in the Supreme Court of New York, Orange County, requested additional information and documentation from Plaintiff regarding his business plans and also requested copies of all documentation regarding the previous sale of his structured settlement payments pursuant to the 2010 Orange County Petition.

25.     Even after selling these additional payments under the 2011 Orange County Petition to finance his entertainment business, Plaintiff would have continued to receive monthly payments of $6,630 per month through May, 2012, then $6,829.54 per month through May, 2014 increasing 3% annually, then $5,695 per month through May, 2034, increasing 3% annually.  Plaintiff would have also continued to receive lump sum payments as follows: $10,000 in June, 2011, 2012 and 2013; $50,000 in June, 2021, and $128,914 in June, 2026. These remaining monthly structured settlement payments and the lump sums were more than sufficient funds for Plaintiff's living expenses and the proposed transfer would have provided Plaintiff with the capital to start his business.

26.     In or about November 2011, Defendant Levine informed Plaintiff that he was moving from Peachtree to Imperial.  Levine told Plaintiff that Imperial had a way to get his deal approved quickly in Florida and that Levine would "take care of everything".  Levine told Plaintiff to cease working with Peachtree and that he should work with Levine's new company, Imperial. Levine told Plaintiff that he would get a better deal working with Imperial than the one that was pending in Orange County.

27.     Levine told Plaintiff that Florida had "better rates" than New York, and so Levine would be able to get Plaintiff more cash in Florida than in New York without selling any more of his future payments.  Levine then told Plaintiff that because this deal was "the same as" the pending deal in New York, and since Plaintiff already had shown that deal to his attorney, he did not need to have his attorney look at this new deal in Florida.

28.     Soon thereafter, Levine began sending Plaintiff pictures of fancy sports cars available for purchase in Florida.  To induce Plaintiff to come to Florida, Levine promised more money for the sale of the same payments.  Levine also told Plaintiff that he could buy fancy clothes and a fancy car with his help if he did the deal in Florida. In or about November 2011, Levine sent Plaintiff a plane ticket to Florida and made arrangements for Plaintiff to stay at a hotel in Fort Lauderdale. Plaintiff traveled from New York to Florida on November 17 or 18 and returned to New York on November 19 or 20 of 2011.

29.     Levine met Plaintiff at the airport late in the evening and took him to a hotel on Las Olas Boulevard in Ft. Lauderdale Florida that had been booked for Plaintiff by Levine.

30.     The next morning, Levine picked Plaintiff up at his hotel and took him to a local bagel store for breakfast.  After they were done eating, a woman who identified herself as Joanne Marcus ("Marcus") arrived.  Marcus identified herself as a real estate agent and indicated that she

had just come from the office. Marcus handed Lafontant what she claimed was a lease and Levine instructed Plaintiff to sign where indicated. Plaintiff specifically recalls being instructed by Levine to sign the lease in two places which he did. Plaintiff never read the entire lease agreement and was never asked for any rent or security deposit in connection with the lease.

31.     Plaintiff now believes that Marcus provided Plaintiff with a lease for premises located at 814 S.E. 13th Street, Apartment 4, Ft. Lauderdale, Florida 33316 although Plaintiff never once set foot in these premises, which are, upon information and belief, owned by Marcus.  Upon further information and belief, Defendants have used these very same premises for other "leases" with other customers who were "relocated" to Florida prior to consummating transactions with Imperial.

32.     With lease in hand, Levine accompanied Plaintiff to a nearby branch of RBC bank. Levine told Plaintiff that he needed to procure additional documents in addition to the lease so they could be ready for the DMV which was next in line.  Levine told Plaintiff not to worry, that he was friends and neighbors with the branch manager and that the branch manager would be helpful in getting Plaintiff's account opened.

33.     At first, the branch manager indicated that Plaintiff did not have enough documentation to open an account.  As Plaintiff recalls, Levine intervened, told the branch manager that he was acting as Plaintiff's attorney and that he was "trying to help Lafontant out with a transaction".  The banker asked Levine if he was still working at Peachtree and Levine responded that he had moved on to Imperial.  The banker agreed to open the account but told Plaintiff that he needed to put one hundred dollars into the account to get it opened.  Levine, without prompting from anyone, took out what appeared to be $100 in cash and handed the cash

over to his banker friend and neighbor.  Plaintiff believed that an account had been opened in his name and Plaintiff left the RBC branch with papers in hand

34.     Once papers where handed over by the banker, Levine immediately took Plaintiff to the DMV.  When Plaintiff's turn came to present paperwork to the DMV clerk, Levine told the clerk that Lafontant was his client and that he was helping him get an identification card.  The DMV clerk told Levine what papers were needed and Plaintiff recalls that Levine specifically stated that Lafontant "has all of those documents right here" and handed over the documents.  The clerk then asked Plaintiff to sign documents and have his picture taken.  Plaintiff was then presented with a Florida identification card almost immediately thereafter.

35.     Upon departing from the DMV at approximately 4 p.m., Levine drove Plaintiff to Miami Beach and took him to the swanky Delano hotel.  The pair then proceeded to dine on fancy food and consume alcohol for several hours on an outdoor deck next to the hotel's infinity pool. At that point, Lafontant felt that the Delano experience was the most luxurious thing he had ever experienced.

36.     After the pair finished relaxing at the Delano, Levine drove Plaintiff back to his hotel in Ft. Lauderdale and told him he would pick him up in the morning.

37.     The next morning, Levine drove Lafontant to a Denny's restaurant that Lafontant recalls felt like was "in another country".  While at breakfast, Levine arranged for a notary by the name of Sharnell Shenekia Spencer to join them with packages of documents for Plaintiff to sign at the breakfast table.  Levine assured Plaintiff that the documents were the same as those he had signed previously in connection with the deal pending in Orange County and that Plaintiff should sign where indicated.  Plaintiff recalls that each of the packages he was instructed to sign had approximately 20 pages and he was instructed to sign or initial many of those pages.

38.     Levine told Plaintiff that the documents he was signing were the same documents that he had previously signed and had reviewed by his New York counsel in connection with the Orange County transaction.   Levine specifically directed Plaintiff to the pages that required signatures and initials.  Each time Plaintiff started looking more closely at the document packages Levine steered him back to signature pages and repeatedly stated that "you already got these in New York, it is the same stuff that you looked at there".  Levine also reiterated several times during that breakfast and signing session in Denny's that the Florida deal was the same as the New York deal, except that Lafontant would be getting more money because "Florida had better rates than New York".

39.     Levine then took Plaintiff back to his hotel in Ft. Lauderdale so he could "take care of some things" and arranged to meet up with Lafontant later in the day.

40.     Levine returned to Plaintiff's hotel in Ft. Lauderdale after a couple of hours and brought him to Euro Car Motorsports to go look at some of the cars Levine had suggested that Lafontant purchase with his sales proceeds.  In fact, as noted herein, prior to taking Lafontant to Euro Car Motorsports, Levine had sent Plaintiff's images of fancy sports cars by email.  When they arrived at the car dealership it was closed but they still looked at some of the cars that were on the lot and Levine encouraged Plaintiff to purchase a fancy car once he got his money.  Levine then took Plaintiff back to his hotel and made dinner arrangements that evening at Morton's steakhouse in Ft. Lauderdale.

41.     Plaintiff later met Levine at Morton's where they were joined by Marcus.  Marcus suggested that Plaintiff look at condos for purchase "when you are ready".

42.     The following morning, Levine met Plaintiff at his hotel, paid for Plaintiff's stay and accompanied Plaintiff to the airport so he could return home to New York.

43.     All of Plaintiff's expenses were paid for or "fronted" by Levine or Imperial.

44.     Levine also told Plaintiff that he could provide him with cash advances if he needed money before his deal was approved in Florida

45.     In fact, Defendant Imperial made at least two cash advances to Levine without explaining the impact these advances would have on Plaintiff's settlement transfers.

46.     According to Defendants, Plaintiff entered into an alleged Absolute Sale and Security Agreement on November 14, 2011 wherein Plaintiff represented that he was a resident of the State of Florida.

47.     On November 14, 2011 Plaintiff was not a resident of Florida, was physically present in the State of New York, and had yet to take his three day trip to Florida to obtain the Florida identification card.

48.     In fact, on November 15, 2011, Plaintiff's attorney in New York submitted additional documentation in support of Plaintiff's pending and active 2011 Orange County Petition that included a detailed budget for Plaintiff's business.

49.     Then on November 19, 2011, Defendants allege that Plaintiff entered into another Absolute Sale and Security Agreement, and yet another Absolute Sale and Security Agreement the very next day, on November 20, 2011.

50.     A far more plausible explanation – and what actually happened in this case – is that Defendant Levine handed or arranged for Plaintiff to be handed numerous documents and instructed him to simply sign where indicated.

51.     As noted above, even though Plaintiff asked Levine if he should have his attorney review the documents for the Florida transaction, Levine specifically stated that there was no need

for his attorney to review the documents because they were the same as the documents Plaintiff's attorney had previously reviewed in connection with the transfer petition in New York.

52.    The Absolute Assignment Agreement that Plaintiff signed in New York and reviewed carefully with his New York attorney looked strikingly similar to the three agreements allegedly dated November 14, 19 and 20, 2011 that Defendants claim were knowingly and willingly signed by Plaintiff in Florida.  In fact, both the New York agreement and the Florida agreements likely emanated from the same original source document.  Both document forms use letters rather than numbers as paragraph identifiers. Both agreements start with "I, Michael Lafontant".  The New York agreement then says "I", "Me" or "Assignor", while the Imperial agreements say "I", "Me" or "Seller", the only difference being the word "Seller" substituted for the word "Assignor".  Paragraphs A, B and C of each agreement are virtually identical.  True and correct copies of pages from the New York agreement and an Imperial agreement are attached hereto as Exhibits "A" and "B" respectively.[1] However, the documents were different in one very material respect which was actively concealed from Plaintiff: the agreements that Plaintiff allegedly signed on November 14, 19 and 20, 2011 all contained broad arbitration provisions that were absent from the New York agreement, and which Plaintiff did not see, did not understand and did not consent to.

53.    Until speaking with counsel of record in this case sometime in February, 2015 Plaintiff did not even know the meaning of the word "arbitration" or the impact of an arbitration provision on his rights, including his constitutional right to a trial by jury.

---

[1] The agreement attached as Exhibit A is missing pages, as Plaintiff has been unable to obtain a complete copy of the 2011 Orange County Petition from the Orange County, New York courthouse.

54.     Acting on Defendant Levine's recommendation, Plaintiff did not review the alleged Florida agreements, shown to him for the first and only time at a Denny's, with counsel.

55.     New York General Obligations Law § 5-1701 *et seq.* (the "New York Structured Settlement Protection Act") specifically prohibits the type of arbitration provisions that Defendants inserted into the Florida agreements and concealed from Plaintiff by informing him that the Florida agreements were the same and did not need further lawyer review, making any consent on Plaintiff's part to these provisions impossible.

56.     Plaintiff returned to New York with stored value cards ("gift cards") that were furnished by Levine and/or Imperial and the expectation that he would soon be flush with cash.

57.     On December 21, 2011 the 2011 Orange County Petition filed under index number 5151/2011 was withdrawn.

58.     On December 22, 2011 a petition was filed in Sumter County, Florida (the "2011 Florida Transaction") seeking approval for Plaintiff to sell the following payments related to three separate agreements (November 14, November 19 and November 20) to Defendants:

(a) monthly payments of $1,000, increasing 3% annually beginning on June 22, 2012 through and including May 22, 2030; annual payments in the amount of $10,000 commencing on June 22, 2012 through and including June 22, 2013; one lump sum of $150,000 due on June 22, 2012; and one lump sum of $253,914 due on June 22, 2026;

(b) monthly payments of $1,500.00, increasing 3% annually commencing on June 22, 2012 through and including May 22, 2030; and

(c) monthly payments of $1,250 increasing 3% annually, commencing on June 22, 2012 through and including May 22, 2030.

59.     Plaintiff thought he was selling one set of payments (the same payments he had planned to sell as part of the 2011 Orange County Petition in New York) as part of one agreement, and did not know Defendants were misleading him into signing three agreements to sell three different sets of payments far in excess of the payments he planned to sell pursuant to the 2011 Orange County Petition.

60.     In early December, Levine told Lafontant that his transaction would be done soon and that he would get his money before New Years'.

61.     Plaintiff decided to return to Florida on or about December 29, 2001 with two of his brothers to celebrate his new fortune and maybe purchase one of the cars Levine showed him.

62.     Levine provided Plaintiff with marijuana upon his arrival at the Florida airport and then handed Plaintiff a stack of additional documents to sign right on the hood of Levine's car.  No notary was present at the time.  Levine told Plaintiff that the documents were needed to complete the Florida deal and that Plaintiff would get his money soon.  Plaintiff recalls questioning whether or not the need for new documentation would interfere with him getting money by New Years, as had been promised.  Levine assured Plaintiff that he would get his money by New Years so Plaintiff continued signing and initialing documents on the hood of Levine's car while his brothers waited around.

63.     In reality, there were no further documents required at that time to complete the 2011 Florida Transaction.  Upon information and belief, Levine actually handed Plaintiff, and had Plaintiff sign, documents evidencing his agreement to sell even more structured settlement payments. Plaintiff did not understand or consent to selling these additional payments, and did not know of, understand or consent to the arbitration provisions contained in those agreements. Levine never mentioned arbitration or arbitration provisions or any of the economic terms of the

agreements.  Levine simply told Plaintiff that he should sign the documents so that he could get his money soon.

64.     Defendant Levine continued to wine and dine Plaintiff.  Just prior to New Year's Eve, Levine told Plaintiff to check his bank account in New York.  Plaintiff received what is believed to be in excess of $200,000 from Imperial just in time to celebrate the New Year in style. Defendants clearly knew that Plaintiff received money in New York as they wired money to him in New York.

65.     Once Lafontant confirmed that he had received a large sum of money in his New York account with Chase, he and his brothers moved to the Delano hotel where they ran up significant bills and celebrated the New Year in style.

66.     Plaintiff had originally sought funding in the amount of approximately $130,000 to build his hip-hop artist representation business.  When Plaintiff asked Levine why he received so much more than he originally sought, he was again told by Levine that "Florida has better rates than New York".

67.     Curiously, the Absolute Assignment and Security Agreement allegedly dated November 14, 2011 by its terms called for Plaintiff to receive approximately $125,000.00 in proceeds – approximately the same amount that Plaintiff expected in the New York transaction.

68.     Somehow, Defendants would have this Court believe that after signing an agreement on November 14, 2011, Plaintiff also knowingly and willingly signed an agreement dated November 19, 2011 and then knowingly and willingly signed yet another agreement the very next day selling even more periodic payments than contemplated by the previous two agreements.

69.     Defendants further suggest that Plaintiff also somehow orchestrated the move to Florida on his own, chose the appropriate "rocket docket" where no personal appearance or

15

scrutiny would be required on his own, located an apartment to rent but not occupy or pay for on his own and hounded Defendant Levine so he could pull together three different complex transactions inside of one week – all of which were somehow done in compliance with relevant state and federal law.

70. Defendants' position is untenable.

71. In fact, the "rates" were not better in Florida as Defendant Levine told Plaintiff. The discount rates applied to the December 2011 Florida Order granted in Sumter County Florida were in excess of 20%, significantly higher than the 15% rate associated with his pending Orange County deal, or rates that are typically approved in New York.

72. The December 2011 Florida Order contained three separate counts reflecting the three highly implausible separate agreements described above.

73. At all relevant times in November and December 2011, Plaintiff believed that he was only entering into just one transaction and that all of the documents he was instructed to sign by Levine were in connection with that one transaction.

74. Defendant Levine actively and purposefully concealed from Plaintiff the fact that he was selling more payments in more transactions than he originally understood.

75. The reason for the inducement and concealment is now readily apparent. The more payments Levine could squeeze into a court order the more money he and Imperial would make. In fact, since it appears that Imperial sold off Plaintiff's payments to a third party purchaser at a low discount rate – significantly lower than the discount rate set forth in the December court order – Imperial and Levine's profit was directly tied to how many payments they purchased and how far out into the future those payments went.

76.     Even though Levine and Imperial profited handsomely at Plaintiff's expense, they were not content to stop until every last payment could be used to fuel their greed.  As implausible as the 2011 Florida Transaction may have been, what followed may have been even worse.

77.     In addition to emailing Plaintiff pictures of Maserati's, after Plaintiff arrived in Florida for the second time on or about December 29, 2011, Levine and Marcus also encouraged Plaintiff to purchase speculative property in Florida.  Marcus took Plaintiff to see several beachfront condominiums and Levine accompanied Plaintiff to the Maserati dealer and encouraged him to buy a fancy car with his newfound riches.

78.     Upon information and belief, neither Levine nor Marcus are licensed to give financial advice.

79.     Upon information and belief, Levine is not licensed to practice law.

80.     In January 2012, Plaintiff purchased a home in Davie, Florida which he ultimately sold at a significant loss.

81.     At Levine's urging, Plaintiff purchased a Maserati.  The Maserati was also sold at an extreme loss.

82.     At some point in June 2013 Plaintiff stopped receiving monthly checks from Allstate. When Plaintiff attempted to reach Levine at Imperial about the cessation of his periodic payments, his calls were ignored. After persistent efforts to reach Levine, Plaintiff finally managed to get Levine to answer his cell phone.  Plaintiff asked Levine what happened to his payments that were supposed to be coming in from Allstate and Levine told him that he sold them all and there was nothing left.  Plaintiff was devastated.

83.     To make matters worse, when Plaintiff asked Levine and Imperial for documents and all of his requests were ignored.  Plaintiff attempted to discuss the matter with Imperial's legal

department and despite his efforts to uncover the truth, Imperial refused to provide Plaintiff with documentation.

84.     At some point in 2014, Plaintiff retained counsel and learned about the following transactions:

- On December 29, 2011, the very day the previous order was entered, a second petition was filed by Imperial in Sumter County.   An Order approving the transfer was issued on January 19, 2012.   Payments sold were monthly payments of $790, increasing 3% every June 22, beginning on 6/22/12 through and including 5/22/2030.

- On March 20, 2012 a third petition was filed in Sumter County.  An Order approving this petition was issued on April 26, 2012. Payments sold were monthly payments of $2,815.87, increasing 3% every June 22, beginning 6/22/2019 thru and including 5/22/2030, and monthly payments of $11,626.84, increasing 3% every June 22, beginning 6/22/2030 through and including 5/22/2039.

- On June 13, 2012 a fourth Order was issued, this time in Broward County, Florida.  Payments sold were monthly payments of $2,289.54, increasing 3% every June 22, beginning on 6/22/2013 through and including 5/22/2019.

85.     According to Plaintiff, he did not authorize, approve or receive the funds associated with the three above-mentioned transactions that took place between January and June 2012 (the "2012 Transactions").  Upon information and belief, Plaintiff may have signed some or all of the agreements related to these transactions on the hood of Levine's car on December 29, 2011, thinking that he was signing more documents related to his pending 2011 Florida Transaction.

18

86.     The January 19, 2012 transaction allegedly So-Ordered by Judge Morley on January 19, 2012 is implausible on its face and Plaintiff denies having consented to such transaction and further denies having received any proceeds of such transaction.

87.     It is highly unusual for an individual seller to file a petition to sell additional structured settlement payments on the same day that the first petition is granted, or to consummate two transactions within 3 weeks of one another and for both transactions to comply with state and federal law.

88.     It is equally unusual for one seller to enter into six agreements covered by four court orders within a six (6) month period resulting in a divestiture of future periodic payments worth millions of dollars and for such transactions to comply with state and federal law.

89.     It is highly improper to encourage and induce a naïve teenager to fake relocating to Florida for the express purpose of avoiding the New York Structured Settlement Protection Act and IRC § 5891. To solicit a 19 year old with easy money cash advances, plane tickets, hotel rooms, fancy meals, gifts, marijuana and promises of riches through improvident investments, turns the New York Structured Settlement Protection Act and IRC § 5891 on their respective heads.

90.     On January 19, 2012, Plaintiff was a resident of and was domiciled in the State of New York.

91.     Plaintiff moved to New Jersey in February, 2013.   After his payments ceased in June 2013, Plaintiff had trouble paying his rent and moved in with family in Reading, Pennsylvania in August of 2013 where he resides today.

92.     Plaintiff depends upon family members for support.  As soon as he is financially able, Plaintiff intends to return to New York.

## CAUSES OF ACTION

## NEGLIGENCE

93.     The allegations of this Complaint are re-alleged and incorporated by reference herein.

94.     The gifts, drugs, cash advances and the prospect of easy money that Levine and/or Defendants offered Plaintiff are contrary to the Structured Settlement Protection Act, which was enacted to protect recipients of long-term structured settlements from being victimized by companies aggressively seeking acquisition of their rights to guaranteed settlement payments, and includes procedural requirements and judicial review on the substantive merits of each petition.

95.     The gifts, drugs, cash advances and the prospect of easy money that Levine and/or Defendants offered Plaintiff are contrary to the alleged "best practices" and standards of conduct adopted by the National Association of Settlement Purchasers ("NASP") the industry trade association.  In fact, the following is featured prominently on the NASP website at https://nasp-usa.com/members/criteria:

1.  **Standards of Conduct**
   Business practices that reflect negatively on the secondary market, which are unfair or deceptive, or which attract criticism from courts, legislators, regulators, or participants in the primary market pose a significant threat to the continued viability of the secondary market. Companies, firms, entities, or individuals that engage in these practices are not welcome in NASP and will not be invited to join NASP or to continue their membership.

   Specifically, Regular Members must:
   - Use their best efforts to comply with all applicable laws, rules, and regulations relative to the secondary market, including applicable federal tax laws and all applicable transfer statutes
   - Adhere to NASP's Code of Ethics and the Consumer Bill of Rights
   - Comply with the rules for use of the NASP Anti-Fraud Database
   - Pay annual dues on time

- Not take or advocate positions or legal theories relative to transfers of structured settlement payments, specifically including legal positions in court or in the general marketplace that conflict with or contradict NASP's positions

96.    Upon information and belief, at all times relevant to this Complaint, Imperial was a dues paying member of NASP.  Imperial knowingly and recklessly disregarded all of the standards outlined above.  Specifically, all Defendants failed to adhere to NASP's Code of Ethics and the Consumer Bill of Rights.

97.    Defendants owed Plaintiff a duty of care with respect to their solicitation of him as a customer and such duty includes compliance with applicable state and federal law.  Defendants at all times relevant to this action held themselves out as experts in the structured settlement secondary market.

98.    The Florida Structured Settlement Protection Act requires that settlement purchasers adhere to the "best interest" standard described above.  In supplying potential customers with sales documentation packages, Defendants are duty bound to provide potential customers like Plaintiff with materials that comply with the requirements of applicable state law and IRC §5891, including the requirement that the transaction be in the customer's best interest.

99.    Defendant's knew or should have known that the transactions consummated from December 2011 to June 2012 were not in Plaintiff's best interest and violated applicable state and federal statutes.

100.    Defendant knew or should have known that Plaintiff resided and was domiciled in New York and that New York would not have approved the transactions described herein.  Upon information and belief Defendants actively concealed Plaintiff's residence from the Florida courts, induced Plaintiff to sign falsified documents and knowingly falsified documents to avoid compliance with the New York Structured Settlement Protection and IRC §5891.

101. Defendants held themselves out as secondary market experts and assured Plaintiff that everything they were doing on his behalf, including in Florida, was appropriate and in compliance with all known structured settlement transfer laws, regulations and industry practices.

102. Plaintiff reasonably relied upon Defendants' representations to his detriment.

103. By providing Plaintiff with document packages that were falsified, misleading and/or inaccurate, Defendants breached their duty to Plaintiff under all applicable state and federal laws.

104. In addition to paying for roundtrip airfare to and from Florida in or around November 2011, and Plaintiff's hotel and other expenses, from approximately June 2011 through December 2011, Defendants made several advances to Plaintiff totaling several thousand dollars and mailed Plaintiff multiple gift cards ranging in value from $50-$100.

105. These advances were predatory, irresponsible and ultimately destructive to Plaintiff.  Defendants' conduct was akin to giving a crack addict another vial.

106. As a result of the aforesaid breaches of the duty of care, Plaintiff has been rendered insolvent in violation of the New York Structured Settlement Protection Act and has been and will be damaged as a result of Defendants' breaches of their duties to Plaintiff, including the loss of his structured settlement payments, and the incurring of liability for attorney fees and expenses.

107. Defendants helped Plaintiff buy a Maserati and knew that buying the Maserati was not consistent with the petition filed or the best interest standard in New York or Florida law.

108. Defendants helped Plaintiff buy a property in Florida, and knew this purchase was not in his best interest.

109. Defendants knew that Plaintiff was depleting the lump sum proceeds in a manner that was clearly and patently not in his best interests, yet Defendants filed three additional

application petitions in Florida by June of 2012 to sell more of Plaintiff's structured settlement payments.

110.    Defendants knew that facilitating four separate sales of structured settlement payments within a six month period, effectively wiping out a lifetime of payments, was not in the best interests of a twenty (20) year old that had monthly payments which would have increased 3% every year for his entire life and would have paid Plaintiff more than $14,000,000 had he lived to 80 years old..

111.    Defendants took specific steps to fraudulently avoid New York transfer laws, including filing papers for the December 2011 Florida transaction that they knew violated the New York and the Florida Structured Settlement Protection Acts, with intent to deceive and for the express purpose of profiting from these illegal transactions, to the grave detriment of Plaintiff.

## **GROSS NEGLIGENCE**

112.    The allegations of this Complaint are re-alleged and incorporated by reference herein.

113.    Defendants owed Plaintiff a duty of care with respect to their solicitation of him as a customer and such duty includes compliance with applicable state and federal law.  Defendants at all times relevant to this action held themselves out as experts in the structured settlement secondary market.

114.    The Florida Structured Settlement Protection Act requires that settlement purchasers adhere to the "best interest" standard described above.  In supplying potential customers with sales documentation packages, Defendants are duty bound to provide potential customers like Plaintiff with materials that comply with the requirements of applicable state law and IRC § 5891, including the requirement that the transaction be in the customer's best interest.

23

115.    Defendants knew or should have known that the transactions consummated from December 2011 to June 2012 were not in Plaintiff's best interest.

116.    Defendant knew or should have known that Plaintiff resided in New York and that New York would not have approved the transactions described herein.  Upon information and belief, Defendants actively concealed Plaintiff's residence and domicile from the Florida courts, induced Plaintiff to sign falsified documents and knowingly falsified documents to avoid compliance with the New York Structured Settlement Protection Act and IRC § 5891.

117.    By providing Plaintiff with document packages that were falsified, misleading and/or inaccurate, Defendants breached their duty to Plaintiff under all applicable state and federal laws.

118.    In addition to paying for roundtrip airfare to and from Florida in or around November 2011, and Plaintiff's hotel and other expenses, from approximately June 2011 through December 2011, Defendants made several cash advances to Plaintiff totaling several thousand dollars and provided him with multiple gift cards ranging in value from $50 - $100.

119.    These advances were predatory, irresponsible and akin to giving a crack addict another vial.

120.    As a result of the aforesaid breaches of the duty of care, Plaintiff has been rendered insolvent in violation of the New York Structured Settlement Protection Act and has been and will be damaged as a result of Defendants' breaches of duty, including the loss of his structured settlement payments, and the incurring of liability for attorney fees and expenses.

121.    It was reasonably foreseeable that Plaintiff would be impoverished and otherwise damaged as a result of Defendants' wanton, willful and reckless disregard for state and federal

law.  In fact, the state structured settlement protection acts and IRC § 5891 were enacted for the express purpose of avoiding the type of transactions complained of herein.

122.    As a direct and proximate result of Defendants' gross negligence and wanton, willful and reckless disregard for state and federal law, Plaintiff has suffered actual damages in excess of $3,700,000.

123.    Because Defendants gross negligence was wanton, willful and in reckless disregard to state and federal law, punitive damages should also be awarded in an amount to be determined at trial.

**FRAUD**

124.    The allegations of this Complaint are re-alleged and incorporated by reference herein.

125.    Defendants specifically misrepresented to Plaintiff that there was nothing improper with stopping the pending 2011 Orange Country Petition, and initiating a new petition in Florida.

126.    Defendants knew that Plaintiff had specific needs for money flowing from a business plan that called for approximately $110,000 to start a business.

127.    Defendants knew that Plaintiff had counsel help him both with developing the business plan and with reviewing the deal with Peachtree to sell a portion of his structured settlement payments to raise that $110,000.

128.    The New York transaction was explained to Plaintiff by his counsel and Plaintiff paid counsel to provide him independent legal advice.  The discount rate for the New York transaction was 15.35% and called for the sale of the following payments:

- $1,550.00 commencing June 22, 2014 and increasing 3% annually, through and including May 22, 2034;

- one lump sum payment of $100,000 due on June 22, 2021; and

- One lump sum payment of $125,000 due on June 22, 2026.

129.    The aggregate amount of the payments to be sold in connection with the 2011 Orange County Petition was $724,788.72.

130.    Defendant Levine told Plaintiff there was no need for him to consult counsel as the documents he was signing with regard to the 2011 Florida Transaction since they were the same as what he signed in New York in connection with the 2011 Orange County Petition. The 2011 Florida Transaction called for the sale of the following payments:

- monthly payments of $1,000, increasing 3% annually beginning on June 22, 2012 through and including May 22, 2030; annual payments in the amount of $10,000 commencing on June 22, 2012 through and including June 22, 2013; one lump sum of $150,000 due on June 22, 2012; and one lump sum of $253,914 due on June 22, 2026[2];

- monthly payments of $1,500.00, increasing 3% annually commencing on June 22, 2012 through and including May 22, 2030[3]; and

- monthly payments of $1,250 increasing 3% annually, commencing on June 22, 2012 through and including May 22, 2030[4].

---

[2] Count One of the December 2011 Florida Order – purportedly covered by an Absolute Sale Agreement dated November 14, 2011.
[3] Count Two of the December 2011 Florida Order – purportedly covered by an Absolute Sale Agreement dated November 20, 2011.
[4] Count Three of the December 2011 Florida Order – purportedly covered by an Absolute Sale Agreement dated November 19, 2011.

131. The aggregate amount of the payments sold in connection with the 2011 Florida Transaction was $1,477,563.59 – more than twice the amount Plaintiff had planned to sell in New York.

132. Defendants knew that Plaintiff only wanted to sell enough payments to cover the needs of starting his new business venture.

133. Defendants misrepresented to Plaintiff that Defendants' plan to bring Plaintiff to Florida to establish residency for purposes of filing a petition in Florida was legal and proper even though Defendants knew Plaintiff was domiciled in New York in November and December of 2011.

134. Defendants knew that Plaintiff did not occupy the premises of lease they arranged for him, and was not planning on occupying those premises. When Plaintiff came back to Florida at the end of December 2011, Levine did not arrange for Plaintiff to stay at the premises he had leased for Plaintiff, and instead directed him to stay at a hotel.

135. Defendants specifically misrepresented to Plaintiff that the deal he would get in Florida would be better than the deal he could get in New York, even though Defendants knew that the significantly higher discount rate they charged Plaintiff to sell some of his structured settlement payments in Florida would result in Plaintiff receiving substantially less, not more money than Plaintiff would have received in New York.

136. Defendants intentionally misled Plaintiff into selling his payments in Florida because Defendants made more money off of Plaintiff than they could have made had they consummated the transaction in New York.

137.     Defendants misled Plaintiff into selling more of his payments in more transactions than he reasonably required so they could profit at Plaintiff's expense without Plaintiff's knowledge or consent.

138.     Defendant knew and specifically intended for Plaintiff to rely on the aforesaid misrepresentations to his detriment.

139.     Plaintiff did reasonably rely on Defendants many representations to his detriment, losing more of his structured settlement payments than he intended to sell, and at a discount rate that yielded much less money from the 2011 Florida Transaction than he would have received through the 2011 Orange County Petition, absent these misrepresentation.

140.     Accordingly, Defendants should be required to pay damages for their fraud in an amount believed to be in excess of $3,700,000.00 plus punitive damages, attorneys' fees and the costs associated with this action.

### FRAUDULENT MISREPRESENTATION

141.     The allegations of this Complaint are re-alleged and incorporated by reference herein.

142.     At all times relevant to this action, Defendants represented that they were reputable settlement purchasers willing to offer Plaintiff cash for his future payments in accordance with the law, specifically, IRC § 5891 and the Structured Settlement Protection Act, New York General Obligations law § 5-1701 *et seq*.

143.     Defendants knew that a pre-condition to applying for and obtaining a qualified court order within the meaning of IRC § 5891 was a showing that the transaction was in the "best interest" of Plaintiff.  In order to get the aforesaid transactions approved, Defendants secured one or more affidavits from Plaintiff setting forth his purported intentions with respect to the payments,

his other sources of income and his residence.  Defendants prepared for Plaintiff, and coached Plaintiff on how to submit false affidavits so they could profit at Plaintiff's expense. Defendants chose the venues they would use, secured a false lease for Plaintiff and coached and cajoled Plaintiff into faking his relocation to Florida.  Defendants made numerous representations to Plaintiff that they knew were false, misleading and destructive and that they knew would be relied upon by Plaintiff to his detriment.

144.    Defendant Levine also made or caused to be made numerous misrepresentations to others in furtherance of this scheme to raid Plaintiffs structured settlement annuity including representing to third parties that he was Plaintiff's attorney.  Defendant Levine is not licensed to practice law.

145.    Defendants engaged in a number of specific acts in furtherance of this fraud, including but not limited to the following:  soliciting Plaintiff in New York; mailing and wiring information or funds to Plaintiff in New York; phone calls; faxes; emails; and text messages to Plaintiff in New York; convincing Plaintiff to withdraw a petition that had been pending  in New York for many months because they wanted to poach him from Peachtree when they knew he was under contract with that company; disregarding the best interest standard; sending stored value cards or cash advance checks to Plaintiff in New York; changing the terms of the December 2011 transaction to include arbitration provisions and higher discount rates without informing Plaintiff; failing to send proper Disclosure Notices as required by law; falsifying documents and encouraging Plaintiff to waive independent professional advice; steering Plaintiff into bad investments, including but not limited to a Maserati; and grooming and coaching Plaintiff about how to misrepresent his state of residence.

146.    Upon information and belief, the transactions complained of herein were not isolated instances but rather were part of a deliberate and wrongful pattern of conduct that Defendants engaged in with a number of individuals based upon the size and potential profit they could extract from large structured settlement annuities.

147.    This type of solicitation and targeting is contrary to the NASP Code of Ethics and the spirit and letter of relevant state and federal law, including but not limited to IRC § 5891.

148.    Defendants misled Plaintiff into selling more of his payments than he reasonably required so they could profit at Plaintiff's expense without Plaintiff's knowledge or consent.

149.    Defendants specifically assured Plaintiff that there was nothing improper with taking the transaction from New York to Florida and persuaded Plaintiff not to show the Florida transaction documents to his lawyer by misrepresenting the contents of those transaction documents.

150.    In November and December 2011, Defendants misled Plaintiff into signing agreements that contained arbitration provisions.  At that time, there were no arbitration provisions in the documents related to the pending New York transaction that plaintiff had reviewed with his lawyer.  Defendants told Plaintiff that the documents related to the 2011 Florida Transaction all related to one transaction, that the terms contained within those documents were the same as in his pending New York transaction documents, and that, as a result, he did not need to review the documents related to the 2011 Florida Transaction with his lawyer.  As a result of those fraudulent misrepresentations, Plaintiff may have signed several agreements that purportedly contained arbitration provisions which Plaintiff had never seen, did not understand, and did not consent to.

151.    Defendants told Plaintiff that he would make tons of money investing the proceeds of his tax free structured settlement in Florida real estate, dispensing financial advice without an appropriate license.

152.    Defendant knew and specifically intended for Plaintiff to rely on the aforesaid misrepresentations to his detriment.

153.    Plaintiff did reasonably rely on Defendants many fraudulent misrepresentations to his detriment,

154.    Accordingly, Defendants should be required to pay damages for fraudulent misrepresentation in an amount believed to be in excess of $3,700,000.00 plus punitive damages, attorneys' fees and the costs associated with this action.

**FRAUDULENT INDUCEMENT WITH RESPECT TO
THE ARBITRATION PROVISIONS**

155.    The allegations of this Complaint are re-alleged and incorporated by reference herein.

156.    Defendants knew that Plaintiff was represented by counsel in New York with regard to the 2011 Orange County Petition.

157.    Defendants further knew that the New York Structured Settlement Protection Act § 5-1704 specifically prohibits a transfer agreement from containing "any provision that waives the payee's right to sue under any law, or where the payee agrees not to sue, or which waives jurisdiction or standing to sue under the transfer agreement".

158.    Defendants also knew that the documents evidencing the transaction pending in New York did not and could not contain any arbitration provisions. As evidenced by the agreements attached hereto as Exhibits A and B, the Imperial agreement purportedly entered into

by Plaintiff contains a broad arbitration provision while the agreement in the New York transaction did not.

159.    In order to induce Plaintiff to travel to Florida so Defendants could raid Plaintiff's structured settlement annuity, Defendant Levine specifically told Plaintiff that the proposed 2011 Florida Transaction contained the same terms as the transaction that was pending in Orange County, New York, when in fact, the 2011 Florida Transaction purportedly contained arbitration provisions that did not exist in the pending Orange County deal.

160.    To induce Plaintiff into leaving New York, Defendant Levine took at least the following additional steps:

  i.    Levine sent money to Plaintiff in the form of stored value cards;

  ii.    Levine sent Plaintiff a plane ticket so that Plaintiff could travel to Florida;

  iii.    Levine met Plaintiff at the airport;

  iv.    Levine arranged for Plaintiff's hotel in Florida;

  v.    Levine arranged for Plaintiff to obtain a lease in Florida;

  vi.    Levine arranged for Plaintiff to open a bank account and provided the money to fund that account;

  vii.    Levine arranged for Plaintiff to get Florida identification, going with Plaintiff into the appropriate state office and acting as his representative with state officials, including doing all the talking for Plaintiff when state officials asked Plaintiff questions; and

  viii.    Levine provided Plaintiff with marijuana and took him out "partying" in Florida.

161.    Defendant Levine also specifically told Plaintiff that he would "take care of everything", get him his money quickly and that Plaintiff would be better off with the Florida deal than the New York deal.

162.    Defendants misled Plaintiff into signing documents that purportedly contained these broad arbitration provisions, even though Plaintiff did not know of, understand, or consent to any arbitration provisions whatsoever.  In fact, as noted herein, prior to learning of the arbitration demand filed by Imperial in Florida, Plaintiff did not know what arbitration was.

163.    Defendant Levine brought in his own notary and instructed Plaintiff to simply "sign" where indicated.

164.    When Plaintiff asked Levine if he should have the Florida documents reviewed by counsel, Levine specifically instructed Plaintiff to waive his right to independent professional advice.

165.    At all times, Plaintiff was led to believe he was doing the same deal he had been pursuing in New York for months.  In fact, as noted herein, the alleged Florida agreements had the same look and feel as the New York agreements, with one notable exception that was concealed from Plaintiff: the broad arbitration provisions.

166.    Defendants knew that their representations to Plaintiff with respect to the Florida transactions were false, misleading and likely to deceive Plaintiff into signing documents that contained provisions that were not known or understood by Plaintiff and specifically intended for Plaintiff to rely on the aforesaid misrepresentations to his detriment.

167.    Plaintiff did reasonably rely on Defendants' many misrepresentations regarding the Florida agreements to his detriment, including the time and treasure associated with fighting a demand for arbitration based upon arbitration provisions that he never saw, understood or

consented to, and which threaten to interfere with his constitutional right to have his claims decided by a jury of his peers.

## FRAUD AS TO THE 2012 FLORIDA TRANSACTIONS

168.    The allegations of this Complaint are re-alleged and incorporated by reference herein.

169.    Defendants filed three additional transfer petitions in Florida during the first six months of 2012 - two in Sumter County, Florida and one in Broward County, Florida. Upon information and belief, Defendants fraudulently obtained Plaintiffs signatures on the documents necessary to these transaction on December 29, 2011, when Levine instructed Plaintiff to sign, outside the presence of a notary and on the hood of his car, additional documents related to the pending 2011 Florida Transaction, but then instead gave Plaintiff documents related to these later filed petitions to sign instead. All three of these petitions were approved at lightning speed[5] and by June of 2012 Defendants had raided Michael Lafontant's structured settlement to the tune of $3,727,449.31 in aggregate payments.

170.    On December 29, 2011, the same day that a judge in Florida approved the 2011 Florida Transaction, yielding over $200,000 to Plaintiff, Defendants filed another petition with the same judge to sell more of Plaintiffs structured settlement payments without the knowledge or consent of Plaintiff.

---

[5] The petition filed in Sumter County Florida on December 22, 2011 was approved just six (6) days later, on December 28, 2011; the petition filed in Sumter County Florida on December 29, 2011 was approved just twenty-one (21) days later; the petition filed in Sumter County Florida on March 20, 2012 was approved on April 26, 2012.

34

171.    Plaintiff had just received the money that he needed to start his business and had no interest in selling more of his payments, and Plaintiff would not have agreed to the petition that Defendants falsely filed on his behalf if he had been aware of Defendants' activities.

172.    Defendants kept Plaintiff in the dark about the petition that Defendants filed on December 29th, seeking neither his approval nor his consent, misrepresenting to the Sumter County judge that the December 29th petition was filed on behalf of Plaintiff.

173.    Defendants concealed from Plaintiff the fact that the Sumter County Court issued an Order on January 19, 2012 approving the petition selling Plaintiff's monthly payments of $790, increasing 3% every June 22, beginning on June 22, 2012 through and including May 22, 2030.

174.     Defendants not only concealed this first 2012 Florida Transaction from Plaintiff prior to its consummation, and after the transaction's completion, Defendants may have also withheld from Plaintiff some or all of the proceeds from the transaction

175.    On March 20, 2012, Defendants filed yet another petition in Sumter County, again without Plaintiffs knowledge or consent, again misrepresenting the fact of that consent to the Court.

176.    On April 26, 2012, the same Sumter County court that approved the December and January 2012 transactions issued an Order approving the petition filed by Defendant Imperial that called for Plaintiff to sell additional monthly payments of $2,815.87, increasing 3% every June 22, beginning June 22, 2019 through and including May 22, 2030, and monthly payments of $11,626.84, increasing 3% every June 22, beginning June 22, 2030 through and including May 22, 2039.

177.    Defendants again concealed this second 2012 Florida Transaction from Plaintiff prior to its consummation, and after its completion, withholding from Plaintiff all of the proceeds from the transaction.

178.    Soon after, Defendants filed a third petition without Plaintiff's knowledge or consent, this time at a different courthouse in Broward County, Florida.  Defendants concealed the filing of this petition from Plaintiff, and misrepresented Plaintiffs' knowledge and consent to the Broward County court.

179.    On June 13, 2012 the Broward County Circuit Court issued an Order approving the petition to sell monthly payments of $2,289.54, increasing 3% every June 22, beginning on June 22, 2013 through and including May 22, 2019.

180.    Defendants again concealed this third 2012 Florida Transaction from Plaintiff prior to its consummation, and after its completion, withholding from Plaintiff some or all of the proceeds from the transaction

181.    Defendants knowingly filed materially false petitions for all three 2012 Florida Transactions, misleading two courts into granting petitions that Plaintiff was not aware of, did not consent to or intend to have filed on his behalf, in reliance on those falsehoods.  Plaintiff's lack of knowledge or consent to all three agreements related to the 2012 Transactions involves and implicates any and all specific terms or provisions contained in those agreements, including the arbitration provisions, discount rate, and all other provisions of which he had no knowledge of, and never consented to.

182.    Defendant knew and specifically intended for Plaintiff to rely on the aforesaid misrepresentations to his detriment.

183.    Plaintiff did reasonably rely on Defendants' many representations to his detriment, and as a direct result of Defendants' material misrepresentations to two courts and their and his reliance on those misrepresentations, Plaintiff suffered the utter and complete loss of his entire economic future.  Defendants acquired all Plaintiff's remaining structured settlement payments without his knowledge or consent, and without giving Plaintiff the rightful compensation due from those 2012 Florida Transactions.

184.    Defendants took numerous specific steps to fraudulently avoid New York transfer laws, including filing papers for the 2012 Florida Transactions that they knew violated the New York and Florida Structured Settlement Protection Acts, with intent to deceive and solely to profit from these illegal transactions, to the grave detriment of Plaintiff.

185.    Wherefore, Plaintiff petitions this court for a Declaration finding that the 2012 Florida Transactions were procured by fraud, that Plaintiff received none of the benefits from these transactions, and ordering that the 2012 Florida Transactions shall be set aside, with the structured settlement payments taken via the 2012 Florida Transactions restored to Plaintiff, and further directing  Defendant Imperial to take all steps to rescind the transactions and restore Plaintiff's benefits, with interest, and to pay appropriate penalties, and attorney's fees.

## CONVERSION

186.    The allegations of this Complaint are re-alleged and incorporated by reference herein.

187.    One or all of the Defendants herein intentionally and without authority assumed control over Plaintiff's structured settlement payment rights.  Plaintiff had the sole right to receive all of the payments that were allegedly transferred to Defendant Imperial in connection with the 2012 Florida Transactions.

188.    By interfering with Plaintiff's rights to the structured settlement payments described above in derogation of Plaintiff's exclusive rights, Defendant Imperial converted Plaintiff's property for its own use without authorization. Due demand for the return of Plaintiff's property has been made and Defendant Imperial has not returned the payments to Plaintiff.

189.    Accordingly, Defendant Imperial should be required to pay damages to Plaintiff of at least $1,529,597.10 which represents the present value of the 2012 Florida Transactions in accordance with 26 U.S.C.A. §7520, plus interest and punitive damages for conversion in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment against Defendants as follows:

A.   General and compensatory damages according to proof at trial;

B.   Punitive damages for fraud, fraudulent misrepresentation, fraudulent inducement, and conversion;

C.   Declarations that:

    i.    Defendants breached their duties to Plaintiff;

    ii.    the 2011 and  2012 Florida Transaction were  procured by fraud;

    iii.    Plaintiff received none of the benefits from the 2012 Florida Transactions;

    iv.    The 2011 and 2012 Florida Transactions shall be rescinded and set aside, with all structured settlement payments taken via these transactions restored to Plaintiff at Defendants expense,

    v.    Defendant Imperial take all steps to rescind the transactions and restore Plaintiffs' benefits, with interest, and to pay appropriate penalties and attorneys' fees;

vi.    Defendants must indemnify Plaintiff for his losses, costs, fees, and expenses including attorneys' fees incurred in connection with this action and any other related actions, and an order directing same.

D.    Disgorgement of commissions, compensation, fees, and other payments made to Defendant Levine;

E.    Disgorgement of all profits received by Defendants or earned by Defendants as a result of their misconduct towards Plaintiff;

F.    An award of Plaintiff's reasonable attorneys' fees and costs and expenses; and

G.    Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury in this action of all issues so triable, and pays the requisite jury fee concurrent with the filing of this Complaint.

DATED this 13th day of March, 2015.

/s/ Edward S. Stone
_____
Edward S. Stone
EDWARD STONE LAW, P.C.
305 Broadway, Suite 1001
New York, NY 10007
(203) 504-8425
Email: eddie@edwardstonelaw.com

Attorneys for Plaintiff

39

**CERTIFICATE OF SERVICE**

I hereby certify that March 13, 2015, I caused the foregoing Amended Complaint to be filed with the United States District Court for the Southern District of New York via the Court's CM/ECF system, which will provide electronic notice to all counsel of record.

*/s/ Edward S. Stone*
Edward S. Stone

# EXHIBIT A

# NEW YORK AGREEMENT

## ABSOLUTE ASSIGNMENT AGREEMENT
## (THE "AGREEMENT")

I, Michael Lafontant, ("I", "Me" or "Assignor") residing at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
am entitled to 5 annual payments each in the amount of $40,000.00 commencing on June 22, 2009
through and including June 22, 2013    360 monthly payments each in the amount of $6,250.00
commencing on June 22, 2009 increasing 3.00% every 12 payments through and including May 22, 2039
and for life thereafter. Lump sum payments as follows: $100,000.00 due on June 22, 2016; $150,000.00
due on June 22, 2021;  and $253,914.00 due on June 22, 2026. (the "Periodic Payments"), which I am
receiving as the result of the settlement of a personal injury claim.  The terms of the settlement are set
forth in an agreement (the "Settlement Agreement").  The Periodic Payments are due to me from Allstate
Settlement Corporation (the "Settlement Obligor").  The Settlement Agreement provides for the Periodic
Payments to be paid to me through an annuity issued by Allstate Life Insurance Company of NY (the
"Annuity Issuer"), Annuity Contract Number ▮▮▮▮▮▮▮▮

A.      I agree to sell to Settlement Funding of New York, L.L.C. ("you" or "Assignee") and its assigns
through an assignment, all of my rights to and interest in the following payments, which I am due to receive
under the Settlement Agreement:

> 240 monthly payments each in the amount of $1,550.00 commencing on June 22,
> 2014 increasing 3.00% every 12 payments through and including May 22, 2034,
> Lump sum payments as follows: $100,000.00 due on or about June 22, 2021; and
> $125,000.00 due on or about June 22, 2026. (the "Assigned Payments"); and

In return [or compensation] for selling and assigning to you my rights to receive these payments, you shall
pay me the sum of: $112,200.00 (the "Assignment Price").

B.      In order to induce you to proceed with this transaction, I make to you the following unconditional
representations, warranties and promises:

1.      No one other than me has any interest or claim of any kind or nature in, to or under the
Assigned Payments.

2.      I am not indebted to anyone that would in any way affect either the assignment of the
Assigned Payments referenced above or Assignee's absolute rights to receive the
Assigned Payments.

3.      I agree to conduct my affairs so as to ensure that you receive these payments exactly in
the amounts, and exactly at the times stated in paragraph A above.

C.      I understand and agree that I will be in breach of this Absolute Assignment Agreement if:

1.      Any of the representations set forth in Paragraphs B (1) and B (2) at any time turn out to be
untrue

2.      I fail to perform the promise set forth in Paragraph B (3) above.

3.      Either the Settlement Obligor or the Annuity Issuer refuses or fails to make any one or
more of the Assigned Payments as a result of any act by me, my estate, my
representatives, or any of my heirs

    4.    I fail to promptly forward to you any of the Assigned Payments that might be received by me from Settlement Obligor or Annuity Issuer after the Assignment to you has been completed

    5.    I fail to fulfill any other obligation of mine under this Agreement.

D.    Your obligation to complete this transaction, and to pay me the Assignment Price depends upon the following conditions being satisfied, unless waived by you.

    1.    You shall be satisfied, in your sole reasonable judgment, that there are no claims or interests of any kind or nature that do or could affect your rights to or interest in the Assigned Payments and/or prevent or interfere with your receipt of the Assigned Payments on the dates and in the amounts described above in Paragraph A, exactly in such amounts and at the times set forth therein.

    2    You have received a final non-appealable court order and/or a signed acknowledgment from Settlement Obligor and Annuity Issuer (collectively referred to as the "Order"), which you, in your sole judgment, consider sufficient to recognize, authorize, and provide for the transfer by assignment of the Assigned Payments (which may continue to be made out to my name) to you, Assignee, and to insure that the Periodic Payments due on or after the day of the Order will be forwarded directly to you

    3.    Assignee shall have received final financing approval from applicable funding source(s).

E.    Security Interest. You and I intend this Agreement to create a security interest in the rights to and interest in the Assigned Payments which I am assigning to you under this Transfer Agreement as "General Intangibles" to the extent permitted under that version of Article 9 of the Uniform Commercial Code (governing Secured Transactions) that is in effect in the state designated in Paragraph F below. This Agreement shall also function as a security agreement. This security interest secures payment of the rights assigned by me to you and the performance of my obligations under Paragraph B above. I authorize you to direct any account debtor or obligor on an instrument, including, without limitation, Settlement Obligor or Annuity Issuer, to make periodic payments directly to you and as contemplated by the Uniform Commercial Code. You (Assignee) are authorized to file a UCC-1 Financing Statement to perfect your rights and the security interest intended to be created under this Agreement.

F    Except as otherwise required by applicable statutory law, this Agreement shall be governed by and interpreted in accordance with the laws of the State of New York.

G.    I hereby grant to you an irrevocable Power of Attorney with full powers of substitution to do all acts and things that I might do regarding the Assigned Payments, and any and all rights I have under the Settlement Agreement with respect to the Assigned Payments. I understand and intend that by doing so, I am giving to you all of the power and right I currently have under the Settlement Agreement with respect to the Assigned Payments, to endorse checks, drafts or other instruments, to alter, edit and change payment instructions and/or beneficiary designations, and/or to perform any other act in my name that, in your sole judgment as my Attorney-in-Fact, you feel is necessary or expedient for you to obtain all of the benefits of the bargain contemplated by this transaction. This power of attorney is coupled with an interest and shall survive my death or disability.

H.  Payments Received by the Party Other Than the Party Intended to Receive the Payments.

    1.    If, prior to the completion of the transfer provided for in this Agreement, I receive any of the Assigned Payments or any portion thereof, I understand and agree an equal amount shall be deducted from the Assignment Price, and the Assignment Price shall be reduced in the same amount as these payments, and that the terms of this Agreement regarding the

payments to be assigned, shall be treated as amended to reflect for the adjusted amount.

2.    In the event you receive or otherwise come into possession of any of the Periodic Payment(s) or portion(s) of such a payment or payments that are not included in the payments being absolutely assigned to you, you agree to forward such amount(s) to me at the address set forth above within seven (7) days of receipt of such amount(s).

I.    You shall be entitled to, and are authorized by me to discharge any liens or adverse claims against me or any of the Assigned Payments, whether or not such adverse claims are disclosed, and you are further authorized by me, provided you provide me with prior written notice, to pay any and all amounts necessary or, if the Assignment Price has been deposited into an escrow account, to instruct the escrow agent to pay any and all amounts necessary to discharge such liens or other adverse claims. I understand and agree that any such amounts that you pay are payments you are making on my behalf and shall be charged against and reduce what I actually receive out of the proceeds of the Assignment Price. Adverse claims may include disclosed amounts to be deducted by you from the Assignment Price to pay you, as servicer for Peachtree Finance Company, LLC, to enable me to obtain Peachtree Finance Company, LLC's release of its encumbrance on a portion of the Assigned Payments relating to a prior transfer transaction(s) that occurred before the enactment of any statute ("Transfer Act") regulating such transfers. I understand and acknowledge that the law now in effect requires that such encumbrance be released in order to complete the transfer that is the subject of this Agreement.

J.    This Agreement shall take effect on the date it is signed by me (the Assignor) or on such later date prescribed by applicable statutory law.

K.    All disclosure statements I receive from you in connection with this transaction are to be considered as incorporated into, and form part of the terms of this Agreement and shall be read as if the contents of the disclosure statements were set forth in full in the body of this agreement.

L.    I know that it will take some time for the Settlement Obligor and the Annuity Issuer to receive and process the court order once it is granted. I would like to receive the Assignment Price or a portion thereof as soon as possible thereafter. Accordingly, I hereby request Assignee to pay me a portion of the Assignment Price as soon as possible after the court order is granted and authorize Assignee to hold in escrow an amount it deems necessary or advisable from the Assignment Price (the "Escrow Amount") until all conditions precedent have been satisfied, including, without limitation, the receipt by Assignee of the Settlement Obligor and the Annuity Issuer's acknowledgment of the terms of the court order in writing and their agreement to honor and comply with same. At such time or earlier as Assignee may determine, I understand that Assignee will send the Escrow Amount to me minus any Assigned Payments that the Annuity Issuer and/or Settlement Obligor sent to me while the Settlement Obligor and the Annuity Issuer were processing the court order.

M.    I have the right to cancel this transfer agreement, without penalty or further obligation, within the first three business days after the date the agreement is signed, by providing you with written notice within the three (3) day period, as provided for in the next paragraph.

# EXHIBIT B
# IMPERIAL AGREEMENT

ABSOLUTE SALE AND SECURITY AGREEMENT
(THE "AGREEMENT")
11/14/2011

I, Michael Lafontant, ("I", "Me" or "Seller") residing at 614 SE 13th St Apt 4, Fort Lauderdale, FL 33316-2083 am entitled to certain periodic payments (the "Periodic Payments"), which I am receiving as a result of the settlement of a personal injury claim. The terms of the settlement are set forth in an agreement (the "Settlement Agreement"). The Periodic Payments are due to Me from Allstate Settlement Corporation (the "Settlement Obligor"). The Settlement Agreement provides for the Periodic Payments to be paid to Me through an annuity issued by Allstate Life Insurance Company of New York (the "Annuity Issuer), bearing Annuity Contract Number ▊▊▊▊▊▊▊▊.

A.     I agree to sell and transfer to Washington Square Financial, LLC dba Imperial Structured Settlements ("You "or "Purchaser") all of my rights to and interest in the following payments, which I am due to receive under the Settlement Agreement

> 216 monthly payments of $1,000.00 commencing on or about
> June 22, 2012, increasing 3.00% annually every June, and
> ending on or about May 22, 2030;
>
> *AND*
>
> 2 annual payments of $10,000.00 commencing on or about
> June 22, 2012 and ending on or about June 22, 2013;
>
> *AND*
>
> 1 lump sum payment of $150,000.00 due and payable on or
> about June 22, 2021;
>
> *AND*
>
> 1 lump sum payment of $253,914.00 due and payable on or
> about June 22, 2026 ("the Settlement Payments")

In consideration for selling and transferring to You my rights to receive these payments, You shall pay Me the sum of: $125,014.49 (the "Purchase Price").

B.     I hereby make the following unconditional representations, warranties and promises:

1. No one other than Me has any interest or claim of any kind or nature in, to or under the Settlement Payments.

2. I am not indebted to anyone that would in any way affect either the sale and transfer of the Settlement Payments referenced above or Purchaser's absolute rights to receive the Settlement Payments.

3. I agree to conduct my affairs so as to ensure that You receive the Settlement Payments exactly as described in Paragraph A above.

C.   I understand and agree that I will be in breach of this Agreement if:

1. Any of the representations set forth in Paragraphs B (1) and B (2) at any time turn out to be untrue.

2. I fail to perform the promise set forth in Paragraph B (3) above.

3. Either the Settlement Obligor or the Annuity Issuer refuses or fails to make any one or more of the Settlement Payments as a result of any act by Me, my estate, my representatives, or any of my heirs.

4. I fail to promptly forward to You any of the Settlement Payments that might be received by Me from the Settlement Obligor or the Annuity Issuer after the sale and transfer to You has been completed.

5. I fail to fulfill any other obligation of mine under this Agreement.

D.   Your obligation to complete this transaction, and to pay Me the Purchase Price depends upon the following conditions being satisfied unless waived by You.

1. You shall be satisfied, in Your sole reasonable judgment, that there are no claims or interests of any kind or nature that do or could affect rights to or interest in the Settlement Payments and/or prevent or interfere with Your receipt of the Settlement Payments on the dates and in the amounts described above Paragraph A, exactly in such amounts and at the times set forth therein.

2. You have received a final non-appealable court order and/or a signed acknowledgment from Settlement Obligor and Annuity Issuer satisfactory to the Purchaser in its sole discretion (collectively referred to as the "Order"), which You, in Your sole judgment, consider sufficient to recognize, authorize, and provide for the transfer by sale of the Settlement Payments (which may continue to be made out to my name) to You, Purchaser, and to insure that the Periodic Payments due on or after the day of the Order will be forwarded directly to You

E.   **Security Interest.** Seller and Purchaser intend that the sale of the Settlement Payments referenced above shall constitute a "sale" from the Seller to the Purchaser under applicable law, which sales are absolute and irrevocable and provide the Purchaser with all indicia and rights of ownership of the Settlement Payments. Neither the Seller nor the Purchaser intends the transactions contemplated hereunder to be, or for any purpose to be characterized as, loans from the Purchaser to the Seller secured by the Settlement Payments.  If, notwithstanding the intention of the parties expressed above, any sale by the Seller to the Purchaser of the Settlement Payments shall be characterized as a secured loan and not a valid sale or absolute transfer or such sale or transfer shall for any reason be ineffective or unenforceable, then this Agreement shall be deemed to constitute a security agreement under the UCC and other applicable law in the rights to and interest in payments due to Me under the Settlement Agreement which I am selling to You under this Agreement.  This security interest secures payment of the rights sold by Seller to Purchaser and the performance of Seller's obligations above. Seller authorizes Purchaser to direct any account debtor or obligor on an instrument, without limitation, Settlement Obligor or Annuity Issuer, to make periodic payments directly to Purchaser and as contemplated by the Uniform Commercial Code.  Purchaser is

authorized to file a UCC-1 Financing Statement to perfect Purchaser's rights and the security interest intended to be created under this Agreement.

F.     Except as otherwise required by applicable statutory law, this Agreement shall be governed by and interpreted in accordance with the law of the state of residence of the Seller on the date of this Agreement.

## ARBITRATION

Any and all controversies, claims, disputes, rights, interests, suits or causes of action arising out of or relating to this Agreement and the negotiations related thereto, or the breach thereof, shall be settled by binding arbitration administered by the American Arbitration Association. The demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association offices in your state of residence. The arbitration shall be held in the largest city in your state of residence. The arbitration shall be held before a single arbitrator selected in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time that the demand for arbitration is filed. Discovery, specifically including interrogatories, production of documents and depositions shall be at the discretion of the arbitrator and to the extent permitted shall be conducted in accordance with, and governed by the Federal Rules of Civil Procedure.

A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event, shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question, would be barred by the applicable statute of limitations.

No arbitration arising out of or relating to this Agreement shall include, by consolidation or joinder or in any other manner, an additional person or entity not a party to this Agreement, except by written consent of the parties hereto, containing a specific reference to this Agreement and signed by the entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to this Agreement, shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

The award rendered by the arbitrator shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof. Such arbitrator shall identify the substantially prevailing party and shall include legal fees and expenses for the substantially prevailing party.

This provision does not apply to the extent inconsistent with applicable state law regarding the transfer of structured settlement payments. In such case any disputes between the parties will be governed in accordance with the laws of the domicile state of the payee and the domicile state of the payee is the proper venue

G.     I hereby grant You an irrevocable Power of Attorney with full powers of substitution to do all acts and things that I might do regarding the Settlement Payments, and any and all rights I have

under the Settlement Agreement. I understand and intend that by doing so, I am giving You all of the power and right I currently have under the Settlement Agreement to endorse checks, drafts or other instruments to alter, edit and change payment instructions and/or beneficiary designations, and/or to perform any other act in my name that in Your sole discretion as my Attorney-in-Fact is necessary or expedient for You to obtain all of the benefits of the bargain contemplated by this transaction. This power of attorney is coupled with an interest and shall survive my death or disability.

## H. Payments Received by Party Other Than the Party Intended to Receive the Payments.

1. If prior to the completion of the transfer provided for in this Agreement, I receive any of the Settlement Payments or any portion thereof, I understand and agree an equal amount shall be deducted from the Purchase Price, and the Purchase Price shall be reduced in the same amount as these payments, and that the terms of this Agreement regarding the payments to be assigned, shall be treated as amended to reflect for the adjusted amount.

2. In the event You receive or otherwise come into possession of any of the Periodic Payment(s) or portion(s) thereof which are not included in the payments being absolutely sold to You pursuant to this Agreement, You agree to forward such amount(s) to Me at the address set forth above within seven (7) days of receipt of such amount(s).

I. You shall be entitled to, and are authorized by Me to discharge any liens or adverse claims against Me or any of the Settlement Payments, whether or not such adverse claims are disclosed, and You are further authorized by Me, provided You furnish prior written notice to Me, to pay any and all amounts necessary or if the Purchase Price has been deposited into an escrow account, to instruct the escrow agent to pay any and all amounts necessary to discharge such liens or other adverse claims. I understand and agree that any such amounts that You pay are payments You are making on my behalf and shall reduce the Purchase Price. Adverse claims may include disclosed amounts to be deducted by You from the Purchase Price to pay You, as servicer for Washington Square Financial, LLC dba Imperial Structured Settlements, to enable Me to obtain Washington Square Financial, LLC dba Imperial Structured Settlements release of its encumbrance on a portion of the Settlement Payments relating to a prior transfer transaction(s) that occurred before the enactment of the applicable statue ("Transfer Act") regulating such transfers. I understand and acknowledge that the law currently in effect requires that such encumbrance be released in order to complete the transfer that is the subject of this Agreement.

J. This Agreement shall take effect on the date it is signed by Me (the Seller) or on such later date prescribed by applicable law.

K. All disclosure statements I receive from You in connection with this transaction are a material part of this Agreement and shall be considered part of the terms of this Agreement and shall be read as if the contents of the disclosure statement were set forth in full in the body of this Agreement.

L. I know that it will take some time for the Settlement Obligor and the Annuity Issuer to receive and process the court order once it is granted. I would like to receive the Purchase Price or a portion thereof as soon as possible thereafter. Accordingly, I would like to receive the Purchase Price or a portion of the Purchase Price as soon as possible after the court order is granted and authorize Purchaser to hold in escrow an amount it deems necessary or advisable from the Purchase Price (the "Escrow Amount") until all conditions precedent have been satisfied, including, without limitation, the receipt by

Purchaser of the Settlement Obligor and the Annuity Issuer's acknowledgment of the terms of the court order in writing and their agreement to honor and comply with same. At such time or earlier as Purchaser may determine, I understand that Purchaser will send the Escrow Amount to Me minus any Settlement Payments that the Annuity Issuer and/or Settlement Obligor sent to Me while the Settlement Obligor and the Annuity Issuer were processing the court order.

M     I have the right to cancel this Agreement, without penalty or further obligation, within the first three business days after the date the Agreement is signed, by providing You with written notice within three (3) day period, as provided for in Paragraph N.

N.     All notices, demands, and other communications required or permitted under this Agreement must be made in writing, and delivered by hand, via the United States Post Office, Certified Mail, Return Receipt Requested, or by overnight delivery service, to You or Me as the recipient at the address set forth in the beginning of this Agreement and must be evidenced by a receipt showing time, date of delivery and the person receiving the delivery.

In witness whereof I hereunto set my hand.

**Michael Lafontant**

STATE OF _____
COUNTY OR CITY OF _____

On the _2.6_ day of _May_, in the year _11_ before me, the undersigned, personally appear Michael Lafontant personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary

PLEASE DO NOT SIGN THIS
DOCUMENT UNTIL 11/14/2011

My Commission expires on: _2/18/14_
Accepted:

Washington Square Financial, LLC dba Imperial Structured Settlements

Title: A-TONY MITCHELL, CEO
Date: 11/2/11

SHARNNELL S SPENCER
MY COMMISSION # DD983104
EXPIRES February 18, 2014
FloridaNotaryService.com